(347 P.3d 670)

No. 111,697

STATE OF KANSAS, *Appellant*, v. TROY MEITLER, *Appellee*.

___

Opinion filed March 27, 2015.

*Andrew R. Davidson*, assistant district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Gregory D. Bell*, of Forker Suter LLC, of Hutchinson, for appellee.

Before SCHROEDER, P.J., BUSER and ATCHESON, JJ.

SCHROEDER, J.: The State appeals the district court's granting of Troy B. Meitler's motion to suppress evidence of a blood sample which revealed the presence of methamphetamine and marijuana shortly after a two-vehicle collision. While driving his car, Meitler crossed the centerline and collided with another vehicle which resulted in the death of the other driver.

Meitler was severely injured in the collision, and while unconscious, his blood was drawn at the hospital at the direction of Trooper John Maier. After criminal charges were filed against Meitler, he filed a motion to suppress the results of the blood draw based on a recent Kansas Court of Appeals decision in *State v. Declerck*, 49 Kan. App. 2d 908, 317 P.3d 794, *rev. denied* 299 Kan. 1271 (2014), which found that K.S.A. 2011 Supp. 8-1001(b)(2) is unconstitutional. The district court suppressed the evidence from Meitler's blood draw, ruling that *Declerck* applied to this case, and the good-faith exception to the exclusionary rule did not apply.

We hold the district court erred in suppressing the evidence of Meitler's blood draw because the good-faith exception to the exclusionary rule is applicable to the facts of this case. Accordingly, we reverse the district court's order suppressing the evidence and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 10, 2012, in Reno County, Trooper Stephen A. Morris of the Kansas Highway Patrol responded to the scene of a two-vehicle accident. Upon his investigation, Trooper Morris determined Meitler was the driver of the car who left his lane of traffic, crossed the centerline, and caused the fatality collision. Although Trooper Morris discovered no evidence of alcohol or drug impairment at that time, he also did not observe any roadway features, conditions, or debris to explain why Meitler crossed the centerline into oncoming traffic causing the collision. Meitler was flown to a Wichita hospital because of the severity of his injuries.

Trooper Morris requested a Sedgwick County-assigned trooper go to the hospital to obtain a sample of Meitler's blood. Trooper John Maier went to the hospital. Trooper Maier was informed by

the dispatcher that Meitler was involved in a fatality accident and had been deemed the at-fault driver. Trooper Maier placed a copy of the implied consent advisory on Meitler's body as he read the advisory aloud, but Meitler was unable to follow along and appeared to be unconscious. Trooper Maier asked Meitler to consent to the blood draw, and after receiving no response, marked "yes" on the advisory. Trooper Maier then directed healthcare personnel to draw Meitler's blood. Trooper Maier took custody of the blood sample which later tested positive for the presence of methamphetamine and marijuana.

Meitler was charged with one count each of involuntary manslaughter pursuant to K.S.A. 2011 Supp. 21-5405(a)(3), aggravated battery pursuant to K.S.A. 2011 Supp. 21-5413(b)(2)(A), and driving under the influence of alcohol or drugs pursuant to K.S.A. 2011 Supp. 8-1567(a)(4). Meitler filed a motion to suppress the results of his blood test, arguing that a fatality collision involving a driver who commits a traffic offense does not provide probable cause the driver was impaired at the time of the collision. Meitler argued to the district court that *Declerck* controlled and, because K.S.A. 2011 Supp. 8-1001(b)(2) which permitted the blood draw was unconstitutional, Meitler's blood-test results should be suppressed. See 49 Kan. App. 2d 908, Syl. ¶¶ 5-7 (finding K.S.A. 2011 Supp. 8-1001[b][2] unconstitutional).

The State countered that *Declerck* was inapplicable because, unlike Declerck who refused the blood draw, Meitler was unconscious, and pursuant to the statute had impliedly consented to the blood draw. Alternatively, the State argued that Trooper Morris' and Trooper Maier's objective and reasonable reliance on K.S.A. 2011 Supp. 8-1001(b)(2) before it was declared unconstitutional warranted applying the good-faith exception to the exclusionary rule, thus permitting the results of the blood draw to be admitted in evidence at trial. At Meitler's suppression hearing, the district court ordered the parties to submit additional briefing on whether the good-faith exception to the exclusionary rule should apply to prevent the evidence from being suppressed.

Upon receipt of the additional briefing, the district court issued an order suppressing the results of the blood draw. First, the dis-

trict court based its ruling on the fact that Trooper Morris did not have probable cause to suspect Meitler was operating or attempting to operate his vehicle under the influence of alcohol or drugs. Second, the district court found that, based upon *Declerck*, K.S.A. 2011 Supp. 8-1001(b)(2) was unconstitutional as applied to this case. Finally, the district court determined the good-faith exception to the exclusionary rule did not apply because Trooper Morris did not rely on K.S.A. 2011 Supp. 8-1001(b)(2) when compelling Meitler's blood draw.

The State timely filed an interlocutory appeal.

## ANALYSIS

K.S.A. 2011 Supp. 8-1001(b)(2) provides:

"(b) A law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a): . . . . (2) *if the person was operating or attempting to operate a vehicle and such vehicle has been involved in an accident or collision resulting in serious injury or death of any person and the operator could be cited for any traffic offense, as defined in K.S.A. 8-2117, and amendments thereto. The traffic offense violation shall constitute probable cause for purposes of paragraph (2).* The test or tests under paragraph (2) shall not be required if a law enforcement officer has reasonable grounds to believe the actions of the operator did not contribute to the accident or collision. The law enforcement officer directing administration of the test or tests may act on personal knowledge or on the basis of the collective information available to law enforcement officers involved in the accident investigation or arrest." (Emphasis added.)

On appeal, the State acknowledges that in *Declerck* a panel of our court declared K.S.A. 2011 Supp. 8-1001(b)(2) unconstitutional under the Fourth Amendment to the United States Constitution. *Declerck* involved a rollover accident which resulted in the death of the passenger in Declerck's vehicle. Declerck was injured and taken to the hospital. At the hospital, Declerck refused to consent to a blood draw requested by an investigating police officer after the officer informed her of the statutorily mandated implied consent advisory. Upon Declerck's refusal, in keeping with K.S.A. 2011 Supp. 8-1001(b)(2) and orders from his supervisor, the officer directed the hospital staff to draw a blood sample from Declerck. Declerck was charged with involuntary manslaughter while driving

under the influence of alcohol or drugs pursuant to K.S.A. 2011 Supp. 21-5405(a)(3) based on the evidence from her blood draw.

Declerck filed a motion to suppress the blood-draw evidence, and the district court sustained the motion. The State filed an interlocutory appeal, and a panel of our court affirmed the district court's suppression of the evidence. The panel held: "K.S.A. 2011 Supp. 8-1001(b)(2) is unconstitutional to the extent it requires a search and seizure absent probable cause that the person was operating or attempting to operate a vehicle under the influence of drugs or alcohol. A traffic infraction, plus an injury or fatality, without more, does not constitute probable cause that drugs or alcohol were involved in the accident." *Declerck*, 49 Kan. App. 2d 908, Syl. ¶ 6.

The *Declerck* panel acknowledged the potential application of the good-faith exception to Declerck's circumstances, but it declined to consider the issue because the State did not raise it before the district court. Thus, there were insufficient facts upon which to evaluate whether this case merited application of the good-faith exception to the exclusionary rule. 49 Kan. App. 2d at 922-23.

Here, while acknowledging *Declerk's potential application*, the State contends it is inapplicable given one distinguishing fact. The State argues that in *Declerck* the driver refused to consent to the blood draw, while in this case Meitler was unconscious and, therefore, consented pursuant to K.S.A. 2011 Supp. 8-1001(a) ("a person who is dead or unconscious shall be deemed not to have withdrawn a person's consent to such test or tests"). Additionally, the State claims that even if K.S.A. 2011 Supp. 8-1001(b)(2) is unconstitutional under the facts of this case, the good-faith exception to the exclusionary rule applies to allow the admission of the blood draw obtained by Trooper Maier in objectively reasonable reliance on that statute.

For purposes of this opinion, we recognize *Declerck* determined that K.S.A. 2011 Supp. 8-1001(b)(2) is unconstitutional because it violates the Fourth Amendment, and we presume that *Declerck's* holding is applicable under the facts of this case. As a result, the sole question presented is whether the district court erred in con-

cluding that the good-faith exception did not apply under the facts of this case.

We begin the analysis by stating our standard of review:

"An appellate court generally reviews a trial court's decision on a motion to suppress using a bifurcated standard. The trial court's findings are first reviewed to determine whether they are supported by substantial competent evidence. Appellate courts do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo. If the material facts in a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review." *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013) (citing *State v. Johnson*, 293 Kan. 1, 4, 259 P.3d 719 [2011]).

Our state and federal Constitutions protect citizens from unlawful searches and seizures. *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010), *cert. denied* 131 S. Ct. 2114 (2011). Here, the district court ordered suppression of Meitler's blood draw by invoking the exclusionary rule. Neither the Fourth Amendment to the United States Constitution nor § 15 of the Kansas Constitution Bill of Rights explicitly prohibits the use of evidence obtained in contravention of their respective protections. *State v. Dennis*, 297 Kan. 229, Syl. ¶ 3, 300 P.3d 81 (2013). To remedy this situation, the United States Supreme Court judicially created the exclusionary rule. 297 Kan. at 235 (citing *Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 2426-27, 180 L. Ed. 2d 285 [2011]). This rule generally provides that evidence obtained in violation of the Fourth Amendment is barred from admission in criminal court proceedings. 297 Kan. at 235. Quite simply, "[t]he linchpin [of the exclusionary rule] is its deterrent effect upon law enforcement" rather than serving as a personal constitutional right of the victim of an illegal search and seizure. *Daniel*, 291 Kan. 490, Syl. ¶ 4.

The United States Supreme Court in *Illinios v. Krull*, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987), discussed the good-faith exception to the exclusionary rule. In *Krull*, the Supreme Court thoroughly explained the application of the good-faith exception to the exclusionary rule. Under the good-faith exception, evidence seized by the police in good-faith reliance on an uncon-

stitutional statute may still be admitted into evidence provided the police obtained the evidence by acting in an objectively reasonable belief that their conduct did not violate the Fourth Amendment. 480 U.S. at 349-50. In *Krull,* the Supreme Court stated that an unconstitutional statute cannot support objectively reasonable reliance by law enforcement under two circumstances:

    (a) If in the enactment, the legislature wholly abandoned its responsibility to pass constitutional law; or

    (b) The statutory provisions are such that a reasonable law enforcement officer should have known the statute was unconstitutional. 480 U.S. at 355.

The Kansas Supreme Court endorsed the *Krull* precedent in *Daniel,* 291 Kan. 490, Syl ¶¶ 7-8.

In our review of the question presented in this case, we will first discuss whether the provisions of K.S.A. 2011 Supp. 8-1001(b)(2) are such that a reasonable law enforcement officer should have known the statute was unconstitutional. Next, we will address our colleague's dissent which argues that in passing K.S.A. 2011 Supp. 8-1001(b)(2), the legislature wholly abandoned its responsibility to pass constitutional legislation.

In ruling that the good-faith exception to the exclusionary rule did not apply in this case, the district court found that "Trooper Morris did not rely on the unconstitutional statute in directing the blood draw." However, the testimony of Trooper Morris was clear that he directed the blood draw because "by statute we're required on a serious accident like this, with the injuries and death . . . we did the blood draws on the drivers to determine alcohol or drugs." Later, Trooper Morris reiterated that the reason he directed the blood draw was "[b]ecause of the statute. To follow—we had to follow the statute that on an accident like this we're required to, to obtain these from drivers." Trooper Morris also confirmed that at the scene, he determined Meitler's vehicle had crossed the centerline. Similarly, Trooper Maier, who actually ordered the hospital personnel to draw Meitler's blood, testified he had verified through dispatch Meitler had committed a traffic offense and was the "at-fault driver." Trooper Maier was also aware of Meitler's injuries and the other driver's death.

Our careful review of the record reveals substantial competent evidence Troopers Morris and Maier relied on K.S.A. 2011 Supp. 8-1001(b)(2) when causing the hospital personnel to draw Meitler's blood for testing. Thus, there was substantial competent evidence to prove Troopers Morris and Maier were aware of the statute and they fully complied with its provisions prior to ordering Meitler's blood draw.

On appeal, Meitler does not contend Troopers Morris and Maier failed to comply with the requirements of K.S.A. 2011 Supp. 8-1001(b)(2). The record clearly reflects the cause of the collision was Meitler's traffic offense of crossing the centerline, resulting in the other driver's death and Meitler's serious injuries. Rather, Meitler's argument focuses on aspects of the troopers' testimony suggesting they did not fully understand the requirements of K.S.A. 2011 Supp. 8-1001(b)(2).

Meitler's argument is mistaken. In *Dennis*, our Supreme Court clarified the objectively reasonable reliance standard by stating: "[I]t was unnecessary for the officer to specifically articulate [the statute] as authority for the search because application of a good-faith exception to the exclusionary rule is not governed by a subjective inquiry. The question is whether an objectively reasonable officer could rely on [the statute]." 297 Kan. at 230. Thus, although it is apparent Troopers Morris and Maier relied on K.S.A. 2011 Supp. 8-1001(b)(2) when obtaining the blood draw, it is not essential they *subjectively* understood the Fourth Amendment implications of this statute. On the contrary, the dispositive question is whether an *objectively* reasonable law enforcement officer should have known the statute was unconstitutional. See *Krull*, 480 U.S. at 355; *Dennis*, 297 Kan. at 230.

We are not persuaded that an objectively reasonable officer on February 10, 2012, should have known the statute was unconstitutional. In 2008, the legislature enacted the amendment contained in K.S.A. 2011 Supp. 8-1001(b)(2). See L. 2008, ch. 170, sec. 1(b)(2). Four years later, Meitler's blood was drawn under the authority of that statute. At the time of Meitler's blood draw, no Kansas appellate court had deemed the amended provision unconstitutional. The *Declerck* opinion was filed on February 7, 2014, 6

years after the amendment and 2 years after Meitler's blood draw. *Declerk* was the first time law enforcement officers were put on notice that K.S.A. 2011 Supp. 8-1001(b)(2) was unconstitutional.

Additionally, the Kansas implied consent law was originally passed by the legislature in 1955. See L. 1955, ch. 61, sec. 1. Since that time, although it has undergone numerous amendments, officers have become accustomed to the statutory scheme which has essentially remained the same over the years. In particular, this scheme requires that law enforcement officers have some basis to believe a driver is intoxicated, oral and written statutory advisories must be provided to the driver, and the driver's consent is requested. See K.S.A. 2011 Supp. 8-1001. Finally, the amendment at issue was brief and limited in its application as compared to the extensive provisions found in the Kansas implied consent law generally. See K.S.A. 8-1001 *et seq.*

Here, the language employed in K.S.A. 2011 Supp. 8-1001(b)(2) was also familiar to law enforcement officers. Under circumstances of a vehicular accident involving serious injury or death and the commission of a traffic offense, the amendment presumed there was "probable cause" to request a blood draw. The expression "probable cause" is a term well known to law enforcement officers given its frequent reference in statutes and caselaw. The use of the term is especially recognizable to officers because it is typically employed in the context of Fourth Amendment search and seizure jurisprudence. In short, the language of the amendment was unremarkable in the context of the implied consent statute.

Under these facts, when tied to the United States Supreme Court precedent, we are unable to conclude that on February 10, 2012, a reasonable law enforcement officer should have known that K.S.A. 2011 Supp. 8-1001(b)(2) was unconstitutional. See *Krull*, 480 U.S. at 355. The district court's contrary legal conclusion finding that the good-faith exception did not apply in this case was error.

Our dissenting colleague agrees the district court erred in declining to apply the good-faith exception because Trooper Morris' "subjective understanding of the statute was amiss." However, our colleague would suppress the blood-draw evidence reflecting Mei-

tler was under the influence of illicit drugs at the time of the fatal collision by applying the legislative test to deny the good-faith exception announced by the United States Supreme Court in *Krull*. That precedent provides: "A statute cannot support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws." 480 U.S. at 355.

As acknowledged by the dissent, in the 28 years since *Krull* was issued, there does not appear to be any reported cases wherein a federal or state appellate court declined to apply the good-faith exception because a legislative body wholly abandoned its responsibility to enact constitutional laws. See *Fairchild v. Lockhart*, 675 F. Supp. 469, 485 (E.D. Ark. 1987) ("The Court is struck, however, by the stringency of the *Krull* test: what is required to foreclose access to the good-faith exception is that the Legislature have wholly abandoned its duties to enact constitutional legislation.").

Meitler failed to present any legislative history or other evidence before the district court to support that the Kansas Legislature wholly abandoned its legislative responsibility under the *Krull* doctrine. Moreover, the district court did not base its suppression ruling on the legislature's complete rejection of its duty to pass constitutional legislation. Thus, the *Krull* doctrine involving the legislature's abandonment of its responsibility should not be applied to Meitler's motion to suppress.

Because "the exclusionary rule was aimed at deterring police misconduct [, citation omitted,] . . . legislators, like judicial officers, are not the focus of the rule. . . . Indeed . . . courts presume that legislatures act in a constitutional manner." *Krull*, 480 U.S. at 350-51; see *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014) (the appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity). In *Krull*, where police acted on an administrative search statute later held to be unconstitutional and there was "no evidence suggesting that Congress or state legislatures have enacted a significant number of statutes permitting warrantless administrative searches violative of the Fourth Amendment, . . . [the United States Supreme Court found] no basis for believing that legislators are inclined to subvert

their oaths and the Fourth Amendment and that . . . 'requires application of the extreme sanction of exclusion.' " 480 U.S. at 351.

Similarly, we see no basis for concluding that the legislators who enacted the 2008 amendment to K.S.A. 2011 Supp. 8-1001(b)(2) to add the language at issue here, against only five "No" votes in both chambers, subverted their oaths and the Fourth Amendment. See L. 2008, ch. 170, sec. 1(b)(2); House J. 2008, pp. 1380, 2628; Senate J. 2008, pp. 1658, 2167-68. Our review of the legislative history reveals no testimony or document proving the legislature's purpose was to override or evade Fourth Amendment rights. There was also no testimony or caselaw presented to the legislature which suggested that similar legislation in other states had been deemed unconstitutional as violating the Fourth Amendment.

On the other hand, there was testimony presented to the Kansas Legislature that the proposed amendment was in compliance with the Fourth Amendment. Shawnee County Senior Assistant District Attorney Karen Wittman testified that the proposed amendment was "a combination of Maine and Oklahoma law . . . [and] both have been deemed constitutional." Minutes, Sen. Judiciary Comm., March 5, 2008, attach. 7, p. 3. In fact, in *State v. Declerck*, 49 Kan. App. 2d 908, 920, 317 P.3d 794, *rev. denied* 299 Kan. 1271 (2014), the panel acknowledged an Oklahoma law similar to K.S.A. 2011 Supp. 8-1001(b)(2) and caselaw supporting its constitutionality. Although the *Declerck* panel found the Oklahoma appellate court's constitutional analysis "unsatisfying and, therefore, unpersuasive," the fact remains the Kansas Legislature was advised that at least one state had passed a similar law, Okla. Stat. tit. 47, § 10-104(B) (1998 Supp.), and that the Oklahoma Court of Appeals held the law did not violate the Fourth Amendment. See 49 Kan. App. 2d at 917-18; *Guest v. State*, 2002 OK CR 5, ¶ 8, 42 P.3d 289 (2002). In short, as acknowledged by the dissent in our case, there was legal authority and caselaw presented to the legislature supporting the constitutionality of the Kansas amendment. Given this legislative history, we cannot find the Kansas Legislature wholly abandoned its duty to pass constitutional legislation.

Finally, in reviewing K.S.A. 2011 Supp. 8-1001(b)(2), the context of this particular legislation must be considered—an amendment

to an *implied* consent statute which had been repeatedly upheld by the Kansas Supreme Court in fairly broad terms. See *State v. Johnson*, 297 Kan. 210, 222-23, 301 P.3d 287 (2013); *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 635, 176 P.3d 938 (2008); *Declerck*, 49 Kan. App. 2d at 920-21 (surveying and distinguishing this caselaw).

On the limited factual record presented and for reasons discussed above, we conclude there is no sufficient factual or legal basis to show that the Kansas Legislature, by passing this amendment, "wholly abandoned its responsibility to enact constitutional laws." See *Krull*, 480 U.S. at 355.

In conclusion, the exclusionary rule does not apply to evidence obtained by law enforcement officers who acted in objectively reasonable reliance on K.S.A. 2011 Supp. 8-1001(b)(2) prior to the Kansas Court of Appeals' decision in *Declerck*, 49 Kan. App. 2d 908.

Under the facts of this case, the district court erred in its factual findings and conclusions of law. We hold Trooper Morris' and Trooper Maier's conduct in ordering the blood draw was in objectively reasonable reliance on the then-existing authority provided by K.S.A. 2011 Supp. 8-1001(b)(2). Accordingly, the district court's order suppressing the blood-draw evidence is reversed, and the case is remanded for further proceedings.

\* \* \*

ATCHESON, J., dissenting:

I.

State legislatures may not override decisions of the United States Supreme Court construing federal constitutional rights by passing statutes designed to thwart those decisions and dilute those rights. That is a fundamental precept of our system of governance integrating the dual sovereignty of state and federal authorities. The search and seizure at issue in this criminal case tests a particular aspect of how that integration ought to work and, in turn, the manner in which the courts must protect citizens against egregious legislative encroachment of their rights secured in the Fourth

Amendment to the United States Constitution. The majority declines to deploy the full measure of that protection. I respectfully dissent.

When a state legislature passes a measure plainly aimed at constricting an established application of the Fourth Amendment, thereby authorizing constitutionally unreasonable government searches and seizures, the enactment cannot be judicially enforced and things law enforcement officers seize in reliance on that enactment should not be used as evidence in any criminal prosecution of the person from whom they were taken. The irrebuttable presumption of probable cause written into K.S.A. 2011 Supp. 8-1001(b)(2) allowing government agents to extract blood samples from drivers if they have been involved accidents resulting in death or serious injury and might be guilty of traffic violations contravenes basic Fourth Amendment protections and was promoted to accomplish precisely that objective. The statute, thus, represents the rare enactment so dramatically at odds with proper legislative purpose and function that the exclusionary rule should be applied regardless of a government agent's good-faith reliance on it. See *Illinois v. Krull*, 480 U.S. 340, 355, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987).

Accordingly, any evidence derived from the blood sample unconstitutionally taken from Defendant Troy Meitler should not be admitted as evidence in the criminal case against him for involuntary manslaughter and related charges. On that basis, I would affirm the ruling of the Reno County District Court granting Meitler's motion to suppress that evidence.

Meitler raised and briefly argued the principle recognized in *Krull* that when a legislature "wholly abandons its responsibility to enact constitutional laws," the good-faith exception does not extend to government searches or seizures made in reliance on that law. 480 U.S. at 355. Although the principle has been routinely acknowledged in appellate decisions dealing with other aspects of *Krull*, I have found no case in which a court has weighed its application in any detail. See, *e.g.*, *State v. Daniel*, 291 Kan. 490, 504-05, 242 P.3d 1186 (2010), *cert. denied* 131 S. Ct. 2114 (2011); accord *United States v. Vanness*, 342 F.3d 1093, 1097-98 (10th Cir.

2003); *United States v. Gambrell*, 178 F.3d 927, 929-30 (7th Cir. 1999); *United States v. Ashburn*, 76 F. Supp. 3d 401 (E.D.N.Y. 2014); *State v. Fierro*, 853 N.W.2d 235, 244 n.6 (S.D. 2014); *Weems v. State*, 434 S.W.3d 655, 666 (Tex. App. 2014). The Illinois Court of Appeals has described that aspect of *Krull* as "cryptic and difficult." *People v. McGee*, 268 Ill. App. 3d 32, 36, 644 N.E.2d 439 (1994). I would generally agree. The boundaries of the requisite legislative abandonment are murky at best. Nonetheless, the circumstances here would seem to be a paradigmatic example for the principle's application. The legislative amendment of K.S.A. 2011 Supp. 8-1001(b)(2) redefined "probable cause"—a phrase taken from the Fourth Amendment itself—in a way that contradicts its settled meaning. If the principle applies at all, it ought to apply in this case.

## II.

The issue requires a brief recapitulation of some essential Fourth Amendment law. The Fourth Amendment itself guarantees citizens the right "to be secure in their persons . . . against unreasonable searches and seizures" and requires any warrant issue only "upon probable cause." Those protections have been incorporated through the Fourteenth Amendment and constrain agents of state and local governments. *Mapp v. Ohio*, 367 U.S. 643, 654-55, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). Although warrantless searches are presumed unreasonable under the Fourth Amendment, the United States Supreme Court has recognized searches based on probable cause coupled with particularized exigent circumstances may be constitutionally permissible. See *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004).

In *Schmerber v. California*, 384 U.S. 757, 770-71, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), the Court held that law enforcement officers may have medical personnel extract blood from a driver suspected of being under the influence without getting a search warrant because alcohol or other intoxicants in the driver's system would be metabolized fairly quickly. The Court found that potential loss of evidence could create an exigency excusing the need for

a search warrant. But the Court required the officer have probable cause to believe the person to be intoxicated and, therefore, that the blood seized and then tested would show the presence of intoxicants. 384 U.S. at 770. The rule has been recently stated this way:

"The Court in *Schmerber* held that probable cause to believe an arrested driver was intoxicated, together with the likelihood that delay in taking blood from the driver would result in the loss of evidence as alcohol dissipated, justified not only the drawing of blood, but also the introduction of the subsequent 'chemical analysis' into evidence." *Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010) (citing *Schmerber*, 384 U.S. at 766-67).

In *State v. Murry*, 271 Kan. 223, 227, 21 P.3d 528 (2001), the Kansas Supreme Court distilled *Schmerber* into three requirements permitting a warrantless blood test for intoxicants: (1) the delay in obtaining a warrant would threaten the loss of the evidence; (2) "the officer must have probable cause to believe the suspect has been driving under the influence"; and (3) the procedures for extracting the blood sample must be reasonable. This is a common formulation of the *Schmerber* holding. See, *e.g.*, *Dale v. State*, 209 P.3d 1038, 1039 n.7 (Alaska App. 2009); *State v. Geiss*, 70 So. 3d 642, 646 (Fla. Dist. App. 2011); *State v. Tullberg*, 359 Wis. 2d 421, 438, 857 N.W.2d 120 (2014).

In short, the *Schmerber* Court rested its ruling on the exigent circumstances arising when a law enforcement officer has probable cause to believe that a person's blood contains intoxicants that would be lost as evidence of a crime if a search and seizure in the form of a blood draw were not conducted promptly. The Court specifically recognized that the separate exception for warrantless searches incident to arrests would not suffice to justify a bodily intrusion of the sort necessary to extract blood. 384 U.S. at 769-70. Accordingly, a law enforcement officer arresting a driver for a simple traffic violation—speeding or failing to signal a turn, for example—could not then constitutionally obtain a blood sample from that individual absent additional facts establishing probable cause to believe the individual to be intoxicated. See *United States v. Chapel*, 55 F.3d 1416, 1419 (9th Cir. 1995); *People v. Trotman*, 214 Cal. App. 3d 430, 436, 262 Cal. Rptr. 640 (1989).

Probable cause remains an essential constitutional requirement to search for and seize evidence from within a person's body, consistent with the words of the Fourth Amendment. That's the point of *Schmerber*, 384 U.S. at 769-71. And *Schmerber* continues to be sound Fourth Amendment law. See *Missouri v. McNeely*, 569 U.S. ____, 133 S. Ct. 1552, 1557-58, 185 L. Ed. 2d 696 (2013) (acknowledging Fourth Amendment rule of *Schmerber*); *People v. Youn*, 229 Cal. App. 4th 571, 576, 176 Cal. Rptr. 3d 652 (2014); *State v. Foster*, 360 Wis. 2d 12, 30-31, 856 N.W.2d 847 (2014) (applying *Schmerber*).[1]

[1]In *McNeely*, the Court held that the exigency excusing a search warrant recognized in *Schmerber*—the balancing of the natural, inexorable dissipation of alcohol or other intoxicants through metabolization with the delay in getting a warrant—must be assessed under the facts of the particular case and does not reflect a categorical rule applicable in every instance. 133 S. Ct. at 1567-68. In some circumstances, a law enforcement officer may be able to obtain a search warrant without jeopardizing the recovery of such evidence and presumably, then, has to seek a search warrant to extract blood. The ruling in *McNeely* does not affect the issue or the analysis in this case.

A warrantless search based on exigency requires the same constitutional "probable cause" as a judicially issued search warrant. *Kirk v. Louisiana*, 536 U.S. 635, 637, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002); *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996); *United States v. Camou*, 773 F.3d 932, 940 (9th Cir. 2014). In the context of a search, probable cause requires that government agents know specific facts that would lead a reasonable person to conclude evidence of a crime may be found in a particular place. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) ("[P]robable cause to search . . . exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."); *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (probable cause for search warrant must establish "a fair probability that contraband or evidence of a crime will be found in a particular place"). This definition of probable cause is neither new nor especially controversial. See *Carroll v.*

*United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543 (1925) (Government agents had sufficient cause to search for illegal liquor when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile in which they were stopped and searched."). Probable cause for a search warrant or a warrantless search based on exigent conditions must be derived from the case-specific "totality" of circumstances. See *Gates*, 462 U.S. at 230-31; *State v. Sanchez-Loredo*, 294 Kan. 50, Syl. ¶ 2, 272 P.3d 34 (2012); accord *United States v. Williams*, 224 F.3d 530, 533-34 (6th Cir. 2000) (Cole, J., dissenting); *Coronado v. State*, 148 So. 3d 502, 505 (Fla. Dist. App. 2014).

In sum, to justify a search of a person's body by taking blood, consistent with *Schmerber* and the Fourth Amendment, a law enforcement officer must be aware of specific facts indicating that person to be under the influence of alcohol or other intoxicants. Those facts would then suggest that the person had ingested intoxicants that would be revealed in the testing of the seized blood. See *Gates*, 462 U.S. at 232 (Probable cause turns on "assess[ing] probabilities in particular factual contexts," so "[r]igid legal rules are ill-suited" to that determination.).

## III.

Those constitutional markers guide the analysis of K.S.A. 2011 Supp. 8-1001, governing the authority of law enforcement officers to conduct blood, breath, and other tests to determine if a driver is under the influence of alcohol or other intoxicants. In this case, Highway Patrol Trooper Stephen A. Morris relied on K.S.A. 2011 Supp. 8-1001(b)(2) permitting a law enforcement officer to obtain a blood draw from a driver who has been "involved in an accident or collision resulting in serious injury or death to another person" when the driver "could be cited for any traffic offense." That subsection of the statute states the evidence supporting the traffic offense furnishes "probable cause" for the seizure of a blood sample. Here, the physical evidence showed Meitler's vehicle crossed

the centerline and struck another vehicle in its traffic lane. The other driver died. Neither Trooper Morris nor any other investigator had any evidence suggesting Meitler had been drinking or was under the influence of alcohol or drugs at the time of the crash. When his blood was taken, Meitler was unconscious and receiving medical treatment for his injuries. Trooper Morris did not attempt to get a search warrant, and Meitler never gave actual consent for the blood draw.[2]

[2]At Trooper Morris' direction, Trooper John Maier went to the hospital where Meitler had been taken. Trooper Maier had no independent information about the collision and acted on Trooper Morris' orders to supervise the blood draw. Meitler and Trooper Maier apparently never spoke or otherwise communicated. For legal purposes, Trooper Maier functioned as an extension of Trooper Morris. His presence makes no substantive difference to the constitutional analysis or to the outcome.

The constitutional failing of K.S.A. 2011 Supp. 8-1001(b)(2) seems plain. It creates an irrebuttable presumption of probable cause based solely on a driver's involvement in a motor vehicle mishap resulting in death or serious injury when the driver could be cited for a traffic violation. But a driving error leading to a death or serious injury does not establish specific facts suggesting a search of the driver's body through the extraction of blood will yield evidence of intoxication. There are all kinds of scenarios where those circumstances may occur without a driver being under the influence. The statute effectively rejects the constitutional standard for probable cause to search in favor of a substantially broader standard and directly conflicts with the requirements of *Schmerber*. As a result, the statute substantively dilutes the Fourth Amendment.

State statutes that constrict protections afforded citizens in the United States Constitution, including the Fourth Amendment, are themselves unconstitutional and unenforceable. See *Berger v. New York*, 388 U.S. 41, 63-64, 87 S. Ct. 1873, 18 L. Ed. 2d 1040 (1967); *State v. Henning*, 289 Kan. 136, 148-49, 209 P.3d 711 (2009). Those enactments violate the Supremacy Clause of the United States Constitution. U.S. Const., art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the

Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding."); see *Younger v. Harris*, 401 U.S. 37, 52, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). The Supremacy Clause renders state statutes and common law ineffective to the extent they materially conflict with or impede federal law. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992); *Hillsborough County v. Automated Medical Labs.*, 471 U.S. 707, 712-13, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985) ("It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." [quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23 (1824)]). Given those principles, this court correctly held K.S.A. 2011 Supp. 8-1001(b)(2) unconstitutional and a search conducted in reliance on it a violation of the Fourth Amendment. *State v. Declerck*, 49 Kan. App. 2d 908, 919, 317 P.3d 794, *rev. denied* 299 Kan. 1271 (2014). The same is true here, as the majority more or less acknowledges.

The district court, therefore, rightly concluded the blood draw—an intrusive search of and seizure from Meitler's person, a place explicitly protected in the language of the Fourth Amendment—to be constitutionally infirm. No particularized facts known to Trooper Morris or any other government agents at the time of the blood draw suggested Meitler to have been intoxicated, let alone established probable cause for such a belief. The State has only the impermissible statutory presumption of K.S.A. 2011 Supp. 8-1002(b)(2) to justify the blood draw. That's not constitutionally good enough.

## IV.

### A.

The question, then, becomes what relief, if any, must be extended to Meitler because of that constitutional violation. The courts commonly apply the exclusionary rule to bar the government from using things seized in violation of a person's Fourth Amendment rights as evidence against that person in a criminal prosecution. See *Herring v. United States*, 555 U.S. 135, 139-40, 129 S.

Ct. 695, 172 L. Ed. 2d 496 (2009); *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). This court recently outlined the evolution of the exclusionary rule from its inception a century ago. See *State v. Althaus*, 49 Kan. App. 2d 210, 219-24, 305 P.3d 716 (2013). The doctrinal development of the rule, though contextual background for the issue here, is not essential, so I do not repeat that discussion.

The *Leon* decision marked a deep retrenchment of the exclusionary rule. The Court held that the rule generally should not apply if law enforcement officers conduct a search in good-faith reliance on warrant signed by a judge. 468 U.S. at 913. Thus was born "the good-faith exception" to the exclusionary rule. The Court reasoned that the exclusionary rule ought to be applied when it would deter *police* conduct violating the Fourth Amendment, so a judge's error in signing a search warrant later found to be constitutionally deficient shouldn't require the exclusion of evidence. Invoking the exclusionary rule for the judicial mistake wouldn't improve police behavior in future cases. 468 U.S. at 918-21. In *Leon*, however, the Court identified several circumstances in which the good-faith exception should not apply, including when the judicial officer signing a warrant has "wholly abandoned" the role of a detached and neutral official. 468 U.S. at 923.

In *Krull*, the Court extended the good-faith exception to the exclusionary rule to law enforcement officers making warrantless searches in reasonable reliance on statutes later found to violate the Fourth Amendment, rendering those searches unconstitutional. 480 U.S. at 349 ("The approach used in *Leon* is equally applicable to the present case [involving an administrative search of a regulated business authorized by state statute]."). So courts generally should admit evidence law enforcement officers have seized before a statute has been held constitutionally infirm. Borrowing further from *Leon*, the Court, however, recognized two situations rendering the good-faith exception inapplicable: (1) if a reasonably trained law enforcement officer would recognize the statute to be constitutionally defective on its face; or (2) "if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws." 480 U.S. at 355.

The *Krull* majority explained in detail why legislators presumably will commonly act to pass constitutional legislation and, therefore, typically need not face the deterrent spur of the exclusionary rule to keep them from overreaching. And law enforcement officers operating within statutory boundaries, therefore, should be afforded good-faith protection for doing so. In summary, the majority suggested: "Legislators enact statutes for broad, programmatic purposes, not for the purpose of procuring evidence in particular criminal investigations." 480 U.S. at 352. The majority, in turn, concluded a judicial determination that a statute violates the Fourth Amendment sufficiently protects those constitutional interests without invoking the exclusionary rule, save for the rare situations when a measure facially contravenes the Fourth Amendment or the legislature has been derelict. 480 U.S. at 352.

The four dissenters in *Krull*, led by Justice O'Connor, sharply disagreed and submitted the constitutional framers had intended the Fourth Amendment as a check on both legislative and law enforcement excesses, thereby warranting suppression of evidence in that case through the exclusionary rule. 480 U.S. at 362-64 (O'Connor, J., dissenting, joined by Brennan, Marshall, and Stevens, JJ.). Justice O'Connor, herself a former state legislator, argued members of the legislative branch, far more so than judicial officers, are prone to yield to political pressures and the vicissitudes of vocal constituencies especially in clipping constitutional rights, such as the Fourth Amendment, that are often publically reviled. 480 U.S. at 365-66. The exclusionary rule would rein in those impulses and preserve the integrity of the Fourth Amendment's checks on impermissible government searches and seizures.

The Kansas Supreme Court has endorsed and applied the rule of *Krull* to expand the good-faith exception from search warrants to statutes. *Daniel*, 291 Kan. at 500. And the court has construed the protections in § 15 of the Kansas Constitution Bill of Rights to be no more extensive than those in the Fourth Amendment. 291 Kan. at 500; but see 291 Kan. at 506 (Johnson, J., dissenting). As a result, the scope of the good-faith exception is not open for further consideration, at least not in this forum.

Here, the majority holds that Trooper Morris relied in good faith on K.S.A. 2011 Supp. 8-1001(b)(2) in ordering the blood draw and, therefore, declines to apply the exclusionary rule to bar the State from using the resulting evidence against Meitler. I have no real quarrel with the majority's finding that Trooper Morris *acted* in good faith, since the blood draw comported with the requirements of K.S.A. 2011 Supp. 8-1002(b)(2). That's true even though Trooper Morris' subjective understanding of the statute was amiss. The district court, therefore, erred in declining to apply the good-faith exception because Trooper Morris misunderstood the statute.

But the inquiry doesn't end there. The good-faith exception should not neutralize the exclusionary rule if either of the exceptional grounds recognized in *Krull* applies. I suppose the reasonable law enforcement officer, hypothecated for forensic purposes, would not recoil upon reading K.S.A. 2011 Supp. 8-1002 and exclaim subsection (b)(2) to be a patent violation of the Fourth Amendment. So the first ground in *Krull* for rejecting the good-faith exception doesn't apply. What remains is the enigmatic limitation on the good-faith exception when a legislature abdicates its responsibility to enact measures consonant with the protections afforded citizens in the Fourth Amendment.

B.

Beyond recognizing legislative abdication as a reason to withhold the good-faith exception, the *Krull* decision offers little in the way of guidance. The Court, of course, analogizes to the provision in *Leon* for judges and to *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979), cited there as illustrative. See *Krull*, 480 U.S. at 355. But the reference affords little help. Apart from citing *Lo-Ji Sales*, the *Leon* Court didn't elaborate on how to determine when judges abandon their duties in reviewing warrant requests. In *Lo-Ji Sales*, a state magistrate judge issued what amounted to an impermissible general warrant to search a business selling pornographic films, magazines, and books and then accompanied government agents as they executed the warrant. The judge spent several hours on the premises reviewing materials brought to him and determining whether there

was probable cause to believe they were obscene and, thus, illegal under New York law. The *Leon* Court obviously found that to be judicial conduct going too far. See 468 U.S. at 914, 923.

I see no clear lesson in the facts of *Lo-Ji Sales* in assessing legislative abdication under *Krull*—I wouldn't expect senators or representatives singularly or collectively to turn up at the scenes of traffic fatalities to advise law enforcement officers as to their authority to conduct blood draws. Nor do I think the *Krull* majority could have been contemplating the sort of interaction that took place in *Lo-Ji Sales*. I presume, rather, the circumstances of *Lo-Ji Sales* are to be considered qualitatively, meaning the legislative action would have to be pretty egregious within the context of what legislators do.

In this respect, the two grounds recognized in *Krull* for withholding the good-faith exception operate independently of each other. The first depends on the readily identifiable unconstitutionality of the statute itself—something a reasonable law enforcement officer would recognize on reading the measure. The other, however, imputes greater discernment to legislators and requires they refrain from passing measures that redefine constitutional language in ways that erode Fourth Amendment rights. In this case, for example, the legislation consisted of a narrow amendment to a broader existing statute. Legislators see proposed changes in the law in that context. Most outsiders, including law enforcement officers, don't. They see only the end product. As a result, a law enforcement officer might not recognize the constitutional shortcomings of an amended statute. But that recognition is irrelevant to the legislative-abdication ground. Were *Krull* read otherwise, the two bases for withholding the good-faith exception would effectively collapse into a single one turning on what a reasonable law enforcement officer would glean from reviewing the overall statute. In *State v. Daniel*, 291 Kan. 490, 504, 242 P.3d 1186 (2010), *cert. denied* 131 S. Ct. 2114 (2011), the Kansas Supreme Court looked at the two bases separately, consistent with *Krull*.

The legislative abandonment of purpose recognized in *Krull* cannot be a complete analog to the judge suggested in *Leon* who wholly abandons his or her neutral role in issuing a search warrant.

The brief reference in *Leon* at least suggests the law enforcement officers relying on the warrant would have to be aware of and presumably appreciate the character of the judge's conduct to be stripped of the good-faith exception. *Leon*, 468 U.S. at 923. That makes some sense. A judge's review of a search warrant application and the approval of the warrant entail a discrete, immediate function to which the individual presenting the papers typically will be privy. The legislative process is altogether different; it is anything but discrete and immediate. A typical bill goes through committee review and hearings in both houses of the legislature. It may be amended multiple times and only then comes up for a vote in each house. The *Krull* majority cannot have intended the exclusionary rule to apply only if the law enforcement officers conducting a search in reliance on an unconstitutional statute were somehow aware of the way the legislature abandoned its responsibility in enacting the statute. Such a rule could never be applied in practice. The Court actually intended to check especially egregious legislative excess impairing Fourth Amendment rights—a check to be applied independently of a law enforcement officer's good faith in later acting on the statute. In short, the Court did not completely insulate the legislative process from the exclusionary rule.

C.

As I have said, I have found no appellate cases delving into when the good-faith exception should be withheld because of legislative abdication. The most detailed discussion appears in two paragraphs in *Daniel*, 291 Kan. at 504-05, indicating the court reviewed the legislative history pertaining to K.S.A. 22-2501(c), governing searches incident to arrest, and found no indication the legislature sought to do anything other than codify existing constitutional law. The court, therefore, saw no abandonment of legislative purpose.[3]

[3]For the most part, the scope of a constitutionally permissible warrantless search after arrest has been defined through decisions of the United States Supreme Court. The Kansas Legislature apparently intended to set out the essence of that law statutorily when it enacted K.S.A. 22-2501(c) in 1970 and amended it in 2006. See *Daniel*, 291 Kan. at 504-05. In 2009, the Court refined and limited the extent to which government agents could search a motor vehicle without a

warrant based on an arrest of the driver or a passenger. *Arizona v. Gant*, 556 U.S. 332, 343-44, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). Despite remaining static since 2006, K.S.A. 22-2501(c) became unconstitutional 3 years later as the result of *Gant* rather than any specific legislative action. *Daniel*, 291 Kan. at 491-92. The legislature has since repealed K.S.A. 22-2501. See L. 2011, ch. 100, sec. 22.

The legislative history for K.S.A. 2011 Supp. 8-1001(b)(2) tells quite a different story. The language that became subsection (b)(2) of K.S.A. 2011 Supp. 8-1001 was promoted to and passed by the Kansas Legislature in 2008 as a narrow, targeted amendment modifying *Schmerber* to allow law enforcement officers to conduct blood draws without constitutionally required probable cause. The original bill contained a second component clarifying the duties of designated medical professionals in drawing blood at the direction of law enforcement officers. The amendment did not reflect the sort of broad programmatic measures the *Krull* majority contemplated in transplanting the good-faith exception to legislative actions. It was, rather, designed to evade constitutional restrictions on gathering evidence in a particular type of criminal investigation—very much the counterpoint the *Krull* majority suggested shouldn't be feared in generally extending the good-faith exception to legislation presumably because the exclusionary rule would still apply in that circumstance.

The 2008 amendment to K.S.A. 2011 Supp. 8-1001 imposed a statutory definition of probable cause applicable without regard to the facts of a given motor vehicle accident and created an irrebuttable presumption of probable cause to search for evidence of intoxication even when the facts of the accident suggested none. The amendment, therefore, clashed with established constitutional principles defining probable cause based on the language of the Fourth Amendment and controlling United States Supreme Court decisions. A legislature cannot undercut constitutional protections that way.

In a written submission to the Senate Judiciary Committee in 2008, Karen C. Wittman, then an assistant district attorney in Shawnee County, identified the three-factor test in *State v. Murry*, 271 Kan. 223, Syl. ¶ 1, 21 P.3d 528 (2001), as the law governing the search of drivers and the seizure of blood samples from them.

Minutes, Sen. Judiciary Comm., March 5, 2008, attach. 7, p. 1. As I have pointed out, that test outlines the requirements laid down in *Schmerber* for a blood draw comporting with the Fourth Amendment. The prosecutor told the committee that a law enforcement officer at the scene of a motor vehicle accident "sometimes does not have enough information . . . to determine 'probable cause' required for a blood draw." Minutes, Sen. Judiciary Comm., March 5, 2008, attach. 7, p. 1. The amendment, according to the prosecutor, would cure that problem, making it easier to get a blood sample. But the cure also violated the constitutional rights of the driver. The amendment plainly aimed to legislatively overrule *Murry* and, necessarily, *Schmerber*.

The prosecutor reported to the committee that Oklahoma and Maine courts had found similar measures to be constitutional. The representation itself wasn't entirely accurate and appears sufficiently incomplete as to be misleading. In *Guest v. State*, 2002 OK CR 5, ¶ 8, 42 P.3d 289 (2002), a panel of the Oklahoma Court of Appeals upheld a similar statute but offered no more than a bare conclusion that it conformed to the Fourth Amendment. See *Declerck*, 49 Kan. App. 2d at 917-18 (discounting *Guest* as persuasive authority for want of any reasoned analysis). The Maine Supreme Court upheld a statute admitting blood-test results in a criminal prosecution arising from a fatal motor vehicle accident if evidence independent of the test gathered at any time during the investigation established probable cause to believe the defendant was intoxicated. *State v. Roche*, 681 A.2d 472 (Me. 1996). Just how *Roche* props up the 2008 amendment to K.S.A. 2011 Supp. 8-1001 that became subsection (b)(2) and its diminution of probable cause is less than clear.[4] By 2008, when the Kansas Legislature adopted the amendment, courts in other states had consistently found comparable statutes to be unconstitutional. See *State v. Blank*, 90 P.3d 156, 161-62 (Alaska 2004); *King v. Ryan*, 153 Ill. 2d 449, 463-64, 607 N.E.2d 154 (1992); *Hannoy v. State*, 789 N.E.2d 977, 992 (Ind. App. 2003); *McDuff v. State*, 763 So. 2d 850, 855 (Miss. 2000); *Com. v. Kohl*, 532 Pa. 152, 164, 615 A. 2d 308 (1992); see also *Declerck*, 49 Kan. App. 2d at 918-19 (discussing caselaw in these and other states).

[4]The Maine Supreme Court acknowledged it relied on an argument to uphold the statute that had been discounted by the Supreme Courts of Illinois and Pennsylvania and, at least by implication, had been accepted nowhere else given the absence of citation to any directly supporting authority. *Roche*, 681 A.2d at 474-75. I have found no other jurisdiction citing *Roche* favorably and embracing its reasoning.

In a written submission to the Senate Judiciary Committee, Peter Bodyk, then chief of traffic safety for the Kansas Department of Transportation, stated the agency supported the amendment as "providing law enforcement personnel the increased ability to test drivers involved in crashes when an injury or fatality has occurred." Minutes, Sen. Judiciary Comm., March 5, 2008, attach. 10, p. 1. Similarly, in written testimony on behalf of the Kansas Peace Officers' Association and the Kansas Association of Chiefs of Police, Ed Klumpp told the committee that the "probable cause" standard for blood draws was "problematic in some cases" and the amendment would avoid "the current restrictions." Minutes, Sen. Judiciary Comm., March 5, 2008, attach. 3, p. 1. and attach. 4, p. 1.

The legislative history, then, reveals a chorus calling for a specific change in K.S.A. 8-1001 designed to make law enforcement more efficient by legislating away protections central to the Fourth Amendment. But the Fourth Amendment is not so evanescent and cannot be eclipsed to promote government efficiency even in the name of aiding police investigations that may otherwise be cumbersome or less than wholly effective. As this court has said, "[a] citizen's Fourth Amendment rights do not rise or fall on the schedules of government agents or their predilections for expediency." *State v. Dugan*, 47 Kan. App. 2d 582, 607, 276 P.3d 819 (2012).

Moreover, a state legislature may not enact statutes defining the words and ideas of the Bill of Rights—here, probable cause—to suit its view of what the United States Constitution ought to be. Doing so evinces a patent abandonment of legislative purpose to pass constitutional measures. A court need not locate some formal declaration of such intent to satisfy the ground identified in *Illinois v. Krull*, 480 U.S. 340, 355, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987). Nor do legislators have to be deliberately so motivated. As lawmakers, they must be expected to have some collective under-

standing of basic constitutional language, principles, and protections. Their willful blindness to or indifferent ignorance of basic Fourth Amendment concepts cannot support an application of the good-faith exception to the exclusionary rule under *Krull*.

Here, the amendment that became K.S.A. 2011 Supp. 8-1001(b)(2) purposefully redefined operative language in the Fourth Amendment, contrary to clearly established law, to dilute protections against government searches and seizures. The Kansas Legislature abdicated its responsibility as the lawmaking branch of a state government in failing or refusing to recognize the plain purpose and result of that measure. This was not some complex, multifaceted statute a small part of which ran afoul of a debatable or arcane aspect of constitutional jurisprudence. Legislators have a duty to appreciate what they are doing when they tinker with the words of the Bill of Rights, including the Fourth Amendment, and to avoid corrupting those rights. The *Krull* Court recognized the need to deter legislators from abandoning their duty in considering and passing measures targeted for just that purpose. The Court, therefore, retained the exclusionary rule to suppress evidence seized pursuant to that rare legislative enactment targeting and shooting down Fourth Amendment rights. See 480 U.S. at 355. The 2008 amendment to K.S.A. 2011 Supp. 8-1001 reflects that sort of constitutional harm.[5]

[5] The majority offers no suggestion as to when the exclusionary rule ought to apply to legislative enactments under *Krull*. In my colleagues' view, however, the exclusionary rule can't apply here apparently because an outside proponent of the amendment possessed of a law degree told a legislative committee it was okay and the measure eventually passed by a wide margin. That the amendment took direct aim at diluting established Fourth Amendment protections—and did so—doesn't really count, as they see it, unless some Greek chorus says as much before the final vote. I cannot turn a similarly blind eye to what *Krull* necessarily must have meant to remedy.

The Kansas Legislature could not reasonably consider and pass a bill that would define sufficient probable cause for a search warrant for controlled substances or paraphernalia to be "the presence of a person as a resident of a dwelling who has been convicted of a felony drug offense within the preceding 5 years." Nor would a

measure to define "religion" in the First Amendment to the United States Constitution to include only biblically based faiths for purposes of the Free Exercise Clause and to exclude them from the Establishment Clause be anything other than constitutional folly. The amendment here wasn't qualitatively much different in light of settled Fourth Amendment law. I would find the resulting provision in K.S.A. 2011 Supp. 8-1001(b)(2) undeserving of refuge from the exclusionary rule, consistent with *Krull*. On that basis, I would affirm the ruling of the district court.[6]

[6]As an alternative ground for reversing the district court, the State has argued the implied consent to testing outlined in K.S.A. 2011 Supp. 8-1001(a) applies to Meitler and he did not withdraw that consent. A driver ostensibly gives consent to a blood test under K.S.A. 2011 Supp. 8-1001(a) simply by operating a motor vehicle in this state. The implied consent in subsection (a), however, is to testing conforming to circumstances outlined in the rest of the statute. It is not a waiver of the driver's Fourth Amendment protection against a blood test or other bodily invasion on less than constitutionally defined probable cause; nor is it a valid consent for Fourth Amendment purposes. See *Declerck*, 49 Kan. App. 2d 908, Syl. ¶ 7; accord *Cooper v. State*, 277 Ga. 282, 290-91, 587 S.E.2d 605 (2003); *Hannoy*, 789 N.E.2d at 987; *cf. State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993) (consent to search "must be given voluntarily, intelligently, and knowingly"); see also *United States v. Farnell*, 701 F.3d 256, 262-63 (8th Cir. 2012) (consent to warrantless search must be "knowing and voluntary" to comport with Fourth Amendment); *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (same). The State's argument is unavailing and does not require reversal of the district court's order.