NOT DESIGNATED FOR PUBLICATION

No. 115,164

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LAWRENCE J. MCCLELLAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Brown District Court; JAMES A. PATTON, judge. Opinion filed March 3, 2017. Affirmed in part, vacated in part, and remanded with directions.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Kevin M. Hill*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., GREEN, J., and BURGESS, S.J.

*Per Curiam*: Following a bench trial, Lawrence J. McClellan was convicted of one count of possession of methamphetamine; one count of driving under the influence of alcohol; one count of possession of drug paraphernalia; and one count of possession of an open container. On direct appeal, McClellan contends the following: (1) that the trial court erred in denying his motion to suppress all physical evidence resulting from the traffic stop; (2) that he did not provide valid consent to have his blood drawn; (3) that the State presented insufficient evidence to support his conviction for driving under the influence of alcohol; and (4) that the trial court erred at sentencing when it considered his prior Nebraska conviction for driving under the influence. Of these five issues, we find

1

only the fourth to be meritorious. We therefore affirm in part, vacate the sentence in part, and remand for resentencing with directions to disregard the Nebraska conviction for driving under the influence for sentencing purposes.

On September 14, 2014, a Brown County patrol deputy stopped McClellan's car near Hiawatha, Kansas. The deputy stopped McClellan because he could not see a license plate or temporary tag on McClellan's car. After stopping McClellan's car, the deputy could see the edge of a piece of paper affixed to the back window of McClellan's car. Still, the deputy was unable to read the lettering on the paper because the car's spoiler obstructed his view. The deputy was unable to read and identify the paper as a temporary tag until he walked past the car to talk to McClellan.

As the deputy approached the car, McClellan stuck his head out of the window. The deputy explained to McClellan why he had been stopped. The deputy told McClellan that he needed to raise his temporary tag so that it was more visible. He told McClellan that he could do so at a later time.

While the deputy spoke with McClellan, he could smell the faint odor of alcohol coming from the car. The deputy also noticed that McClellan's eyes were bloodshot and watery and that he was having difficulty speaking. The deputy asked McClellan how much he had had to drink, and McClellan stated that he had not had a lot to drink that night. The deputy took McClellan's driver's license to his patrol car to run a check on it. McClellan's license was valid and did not show any warrants. The deputy decided that he was not going to cite McClellan for any violation related to the temporary tag. At that time, a sergeant with the Brown County Sheriff's Department arrived to help the deputy.

The deputy returned to McClellan's car and asked him to step out. McClellan told the deputy that he was disabled and could not walk well without the use of a cane because he had a prosthesis. The deputy, however, did not see a cane in McClellan's car,

2

and he later learned that McClellan did not actually have a prosthetic leg. McClellan got out of the car by steadying himself on the door and the pillar behind the door. When McClellan stood up, he was staggering and having difficulty standing.

Once McClellan was out of his car, the deputy asked if he could pat him down for weapons. McClellan had his hands in his pockets. He took his hands out of his pockets and threw a clear plastic container that resembled a Tic-Tac container into his car. The sergeant also witnessed McClellan throw a small object into his car. The deputy patted him down and did not find any weapons. The deputy told McClellan to walk to his patrol car. As McClellan walked, the deputy saw that he was walking with "heavy feet." Also, McClellan was not walking straight and nearly fell down because he lost his balance. The deputy had McClellan sit on the bumper of his patrol car.

The deputy then administered a Horizontal Gaze Nystagmus test. The deputy explained how the test worked; McClellan had difficulty complying with the instructions. The deputy attempted to administer the "walk and turn" test, but McClellan told him that he was unable to perform the test. McClellan also told the deputy that he could not count backwards. The deputy did not administer the "one-leg stand" test either because he believed that McClellan had a prosthetic leg.

The deputy took McClellan to his patrol car. The deputy told McClellan that he was not under arrest at that time. Still, the deputy gave McClellan his *Miranda* rights. Inside the patrol car, the deputy noticed a stronger odor of alcohol coming from McClellan. The deputy asked McClellan how much he had had to drink that night. McClellan told the deputy that he had had three small drinks. McClellan acknowledged that the drinks were mixed drinks. Meanwhile, the sergeant was questioning two female occupants in McClellan's car. The sergeant asked the occupants if there were any open containers of alcohol in the car. One of the occupants handed the sergeant a large bottle of Rich and Rare Whisky and a white and green plastic cup with fluid in it. The passenger

3

in the back seat of the car retrieved both items from the back passenger-side floor. The sergeant placed the bottle of whisky on the roof of McClellan's car.

From his patrol car, the deputy saw the bottle of whisky on the roof and asked McClellan to whom it belonged. McClellan told the deputy that it was his. The deputy asked McClellan if he had been drinking while driving. Initially, McClellan told the deputy that he had not been drinking while driving. McClellan eventually admitted that he had been drinking while he was driving. The deputy asked McClellan to take a preliminary breath test (PBT). The test showed a result of 0.112. The deputy left his patrol car to speak with the sergeant about the contents of McClellan's car. Then the deputy placed McClellan under arrest.

The sergeant noticed a small clear plastic container on the floor of McClellan's car. The sergeant believed that the container was the item he had seen McClellan throw into the car before the deputy patted him down. The sergeant recovered the small plastic container and gave it to the deputy. The container appeared to have white crystal residue in it. McClellan admitted to the deputy that the container appeared to have crystal meth in it. McClellan also admitted to using methamphetamine. McClellan told the deputy that he had snorted meth earlier that evening in Nebraska but denied that the container belonged to him.

The deputy provided McClellan with a copy of the implied consent notices. The deputy then read the notices to McClellan. After reading the notices, the deputy asked McClellan if he would submit to a blood draw to test for alcohol in his system. Initially, McClellan refused to consent to a blood test. The deputy told McClellan that he would apply for a search warrant to draw the blood. McClellan acknowledged that he was likely going to lose his driving privileges for 1 year whether he consented to the blood test or not because he was a repeat offender. The deputy told McClellan that if he was granted the search warrant, he would take McClellan's blood and then McClellan would be

4

charged with driving under the influence *and* refusal. McClellan then consented to the blood test.

McClellan's blood was drawn at Hiawatha Community Hospital within 3 hours of the stop. The blood sample was delivered to the Kansas Bureau of Investigation (KBI) for testing for the presence of ethyl alcohol. The blood was tested using the Headspace Gas Chromatography method, which is "generally recognized in Forensic Toxicology as reliable for the identification of ethyl alcohol in blood, and [has] been accepted by Kansas courts in previous cases." The results of the KBI's test showed McClellan's blood contained 0.08 grams of ethyl alcohol per 100 milliliters of blood. The report also contained an "Uncertainty of Measurement," which stated that the uncertainty was $0.084 \pm 0.006$ at a confidence level of 99.7%. The KBI was also able to confirm that the crystal-like substance found in the small plastic container in McClellan's car was methamphetamine.

McClellan was charged with one count of possession of methamphetamine, one count of driving under the influence, one count of possession of drug paraphernalia, and one count of transporting an open container of alcohol.

Before trial, McClellan moved to suppress evidence. He requested that the trial court suppress all of the physical evidence obtained as a result of his traffic stop, including the results of the Horizontal Gaze Nystagmus Test, the preliminary breath test, the blood test, and the search of his car. After holding an evidentiary hearing on McClellan's motion to suppress, the trial court denied the motion.

The matter proceeded to a bench trial. At the beginning of the trial, the parties stipulated that McClellan would be granted a continuing objection to the admissibility of evidence based on the arguments presented at the hearing on his prior motion to suppress. McClellan did not, however, object to the foundation of the evidence. On June 15, 2015,

the trial judge entered a memorandum decision finding McClellan guilty of one count of driving under the influence, one count of possession of methamphetamine, one count of possession of drug paraphernalia, and one count of transporting an open container of alcohol.

At sentencing, McClellan was assigned a criminal history of I. McClellan had previously been convicted of driving under the influence in Beatrice County, Nebraska, in 2009. McClellan was sentenced to a total underlying prison term of 11 months. In place of prison, the sentencing court imposed 12 months of probation. Ultimately, the trial court ordered McClellan to serve 5 days in the Brown County jail and then be released to the supervision of community corrections for a period of 12 months.

*Did the Trial Court Err in Denying McClellan's Motion to Suppress All Physical Evidence Resulting From His Traffic Stop?*

Appellate courts apply a bifurcated standard of review when reviewing a trial court's decision on a motion to suppress. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). First, the court determines whether the trial court's findings are supported by substantial competent evidence. 304 Kan. at 274. The court will not reweigh the evidence or credibility of witnesses and will not generally resolve conflicting evidence. 304 Kan. at 274. If the material facts relating to the motion to suppress are not disputed, the question of whether to suppress the evidence is a question of law over which the appellate court has unlimited review. 304 Kan. at 274.

McClellan first argues that the trial court erred in denying his motion to suppress because the deputy lacked reasonable suspicion to extend the traffic stop after he decided not to cite McClellan for his failure to display a visible tag on his car. McClellan next argues that the trial court erred in denying his motion to suppress because the State failed

6

to show that the search that resulted in the recovery of the methamphetamine was legal. We will consider these arguments in the order presented.

*Did the Deputy Have Reasonable Suspicion to Extend the Stop?*

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights protect against unreasonable searches and seizures. *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014). A seizure occurs when a law enforcement officer stops a vehicle on a public roadway by a show of authority and restrains an individual's liberty. 300 Kan. at 637. The seizure of an individual by a law enforcement officer is not constitutionally reasonable unless the officer knows specific and articulable facts that create reasonable suspicion that the individual is committing, has committed, or is about to commit a crime. 300 Kan. at 637.

After a legal traffic stop is initiated, a law enforcement officer may request a driver's license and registration, conduct a computer check on the driver's documentation, and issue a citation. *State v. Spagnola*, 295 Kan. 1098, 1104, 289 P.3d 68 (2012). If the length of the stop is prolonged, the officer must have objectively reasonable and articulable suspicion that the individual is committing, has committed, or is about to commit a crime, or the individual must consent to further questioning. 295 Kan. at 1105.

> ""'[W]e judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] 'Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious,' [citation omitted], but to determine whether the totality of the circumstances justify the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a 'minimum level of objective justification' which is 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" [Citation omitted.]'" *State v. Pollman*, 286 Kan. 881,

7

890, 190 P.3d 234 (2008) (quoting *State v. DeMarco*, 263 Kan. 727, 734-35, 952 P.2d 1276 [1998] [quoting *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997)]).

McClellan argues that the deputy who stopped him did not have reasonable suspicion that he was driving under the influence and, therefore, was not justified in extending the traffic stop after the deputy decided not to issue McClellan a citation for the temporary tag issue.

First, McClellan argues that "[a]n important factor . . . is the relationship between the cause of the initial stop and driving under the influence." McClellan offers the *Pollman* case in support of his argument. In *Pollman*, our Supreme Court found that an officer was initially justified in investigating what motivated the defendant's refusal to follow lawful instructions, including whether the defendant's conduct was motivated by intoxication. 286 Kan. at 895. During the investigation, the defendant, who the officer had seen driving a motorcycle before their encounter, admitted that he had consumed "a few" beers. 286 Kan. at 895. The officer could also smell the odor of alcohol coming from the defendant. The court found that "[a]s circumstances coalesced, a reasonable suspicion of DUI existed." 286 Kan. at 895. The *Pollman* court held that the following factors led to the officer's reasonable suspicion that the defendant had been driving under the influence: (1) the defendant obstructed the officer's duties; (2) the defendant admitted to drinking alcohol; and (3) the defendant smelled of alcohol. 286 Kan. at 894-96.

Thus, McClellan is correct that the relationship between the reason for the initial stop and the investigation of driving under the influence *can be* an important factor considered in the totality of the circumstances. It is not, however, a condition precedent to an officer conducting a valid investigation of an individual suspected of driving under the influence. See *Pasek v. Kansas Dept. of Revenue*, No. 91,933, 2004 WL 2694279, at *3-4 (Kan. App. 2004) (unpublished opinion) (court expressly rejected argument that officers do not have reasonable suspicion to conduct DUI investigation based on obvious

8

odor of alcohol if engaged in a traffic stop for violations other than "the typical DUI situation"); see also *City of Norton v. Stewart*, 31 Kan. App. 2d 645, 70 P.3d 707 (2003) (stop for inoperable headlight properly extended to investigate DUI after officer smelled alcohol coming from car).

McClellan extends his argument, asserting that "[w]hen a stop and investigation for driving under the influence is not justified by detention for other illegal activity, the analysis changes." McClellan maintains that his situation is similar to that of the defendant in *City of Hutchinson v. Davenport*, 30 Kan. App. 2d 1097, 54 P.3d 532 (2002). The *Davenport* court focused on whether the initial traffic stop of the defendant was proper. See 30 Kan. App. 2d at 1098 ("The case presents a single question: Was the stop of [the defendant] by the arresting officer proper under K.S.A. 22-2402?"). Nevertheless, we are considering a question that is wholly distinct from the single question presented in *Davenport*. Here, we must determine whether the extension of the valid traffic stop was supported by reasonable and articulable suspicion that McClellan had been driving under the influence.

In *Davenport*, the defendant went to the Hutchinson Law Enforcement Center (Center) after his daughter was arrested. An officer at the Center could smell the odor of alcohol on the defendant's breath. The officer told the defendant not to drive when he left the Center. The defendant told the officer that he was walking home, which the officer thought was strange because the defendant said he lived in Wichita. The officer watched the defendant leave the Center and eventually get into a pickup truck and drive away. The officer called another patrol officer who was in the area and told him that the defendant was possibly driving under the influence. The patrol officer then stopped the defendant. The court affirmed the trial court's decision to grant the defendant's motion to suppress the stop, finding that

"[e]ven with the lesser requirements of the reasonable suspicion standard, the trial court properly determined that there were no articulable facts which create[d] a suspicion that [the defendant] was driving while under the influence or was involved in any other criminal activity. . . . [T]he only facts suggestive of unusual conduct are that [the defendant] had alcohol on his breath and that he stated he was walking. Neither of these facts by themselves or together create[d] a reasonable suspicion that justified . . . stopping [the defendant] in the absence of some indication that he was intoxicated and too impaired to drive." *Davenport*, 30 Kan. App. 2d at 1101.

Here, however, there is no dispute that the initial stop of McClellan was valid. The deputy could not see a license plate or temporary tag on McClellan's car when the stop occurred, which gave him reasonable suspicion that a crime was being committed under K.S.A. 2015 Supp. 8-133. This statute mandates that "[e]very license plate shall at all times be securely fastened to the vehicle . . . in a place and position to be clearly visible . . . ." McClellan argues, however, that "the quick resolution of the purpose for the initial stop ended the lawful detention, requiring the subsequent [driving under the influence] investigation be based solely on [the deputy's] interactions with . . . McClellan during that brief period." Nevertheless, it is important to examine what was known by the deputy when he interacted with McClellan.

McClellan concedes that when the deputy extended the stop, he had smelled a faint odor of alcohol coming from McClellan; McClellan's eyes were bloodshot and watery; McClellan slurred his words; McClellan fumbled with his driver's license; and McClellan admitted to drinking alcohol, though he told the deputy that he had not had a lot to drink. McClellan argues that the facts known to the deputy only tended to show that McClellan had consumed alcohol, not that he was operating his car under the influence of alcohol. McClellan cites *City of Wichita v. Molitor*, 301 Kan. 251, 341 P.3d 1275 (2015), to support his assertion that "there is a notable distinction between suspecting a person has alcohol in their system and suspecting a person of committing the crime of driving under the influence."

10

In *Molitor*, the defendant was pulled over after he failed to use his turn signal. When the defendant pulled his car to the side of the road, he came to a stop with his tire halfway up the curb.

> "[The officer] approached the vehicle and observed that [the defendant's] eyes were watery and bloodshot and that a strong odor of alcohol was emanating from the vehicle. [The officer] asked [the defendant] if he had been drinking, and [the defendant] responded that he had consumed two or three beers. [The defendant's] speech was not slurred; he had no difficulty producing his driver's license, insurance information, and vehicle registration; and he did not lose his balance while exiting his vehicle or walking thereafter. The officer continued to smell a strong odor of alcohol as [the defendant] exited the vehicle." 301 Kan. at 253.

The officer then administered the Horizontal Gaze Nystagmus test, the walk-and-turn test, and the one-leg-stand test. The defendant passed two of the three field sobriety tests, yet the officer still requested that the defendant submit to a PBT. Our Supreme Court held that the officer did not have reasonable suspicion that the defendant was driving under the influence when the officer requested the PBT because

> "[a]fter stopping the vehicle, [the defendant] spoke without slurring his words, produced his identifying documents without difficulty, exited and proceeded from his vehicle without losing his balance, and, most importantly, passed the two admissible SFSTs. In other words, under the totality of circumstances, one could not reasonably suspect that [the defendant's] balance was impaired by alcohol to the point of being legally under the influence of alcohol." 301 Kan. at 268.

*Molitor* is distinguishable from our situation for a multitude of reasons. First, the officer in *Molitor* was required by statute to have reasonable suspicion that the defendant was operating a vehicle under the influence of alcohol before he could request the defendant take a PBT. *Molitor*, 301 Kan. at 257 (citing K.S.A. 2010 Supp. 8-1012[b]). Here, we are not determining whether the deputy had reasonable suspicion to request a

11

PBT. We are merely considering whether the deputy had reasonable suspicion to extend the stop and investigate whether McClellan had been driving under the influence.

Second, the court in *Molitor* had ample evidence supporting the proposition that the defendant was not intoxicated. Most importantly, the defendant passed two field sobriety tests; he did not slur his speech; he did not have difficulty producing his documentation; and he did not lose his balance when he got out of his vehicle or any time afterwards. Here, the deputy had smelled the odor of alcohol coming from McClellan; he heard McClellan slurring his words; he witnessed McClellan fumble with his identification; he saw that McClellan's eyes were bloodshot and watery; he saw McClellan lose his balance when he got out of his car; McClellan told the deputy he could not perform the field sobriety tests; and McClellan admitted to consuming alcohol. The only mitigating circumstance was that the officer did not see McClellan drive erratically before he stopped him.

A law enforcement officer may properly request that a driver get out of his or her vehicle when the vehicle has been stopped for a traffic violation. See *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977). Although the deputy could see that McClellan did have a temporary tag in the rear window when he approached McClellan's car, his reasonable suspicion that a violation of 8-133 had occurred was not dispelled simply by seeing the tag. See K.S.A. 2015 Supp. 8-133 ("Every license plate shall at all times be securely fastened to the vehicle . . . in a place and position to be clearly visible . . . ."); see also *United States v. Lyons*, 510 F.3d 1225, 1234 n.3 (10th Cir. 2007) (police officer had reasonable suspicion that traffic violation had occurred when officer could not read the expiration date on license plate because it was dirty).

Here, the deputy clearly testified that the temporary tag, though valid, was obscured by the spoiler on McClellan's car. Thus, the deputy's reasonable suspicion was

not dispelled when he saw that the tag was valid. Moreover, even if the deputy's reasonable suspicion that a crime had been committed was dispelled by seeing the temporary tag, it was proper for him to confront McClellan and explain the reason for why he was being stopped. See *State v. Diaz-Ruiz*, 42 Kan. App. 2d 325, 332, 211 P.3d 836 (2009) (citing *United States v. McSwain*, 29 F.3d 558, 561-62 [1994]) (officer who had dispelled initial reasonable suspicion justifying stop could still explain reason for stop and then let driver leave without further questioning). Either way, the deputy was in a lawful position and had not unduly extended the duration of the stop when he smelled the odor of alcohol coming from the car, along with the other factors indicating that McClellan may have been operating his car under the influence of alcohol.

Thus, the totality of the circumstances show that the deputy had an objective justification to extend the stop and investigate whether McClellan had been driving his car under the influence of alcohol. The deputy smelled alcohol coming from McClellan; McClellan's eyes were bloodshot and watery; McClellan had difficulty speaking and producing documentation; and McClellan admitted to having consumed alcohol that night. Furthermore, McClellan had difficulty maintaining his balance when he got out of his car and refused to perform some sobriety tests. In considering whether these circumstances provided the deputy with reasonable suspicion, we must give deference to the deputy's training and ability to distinguish between lawful and suspicious conduct. Therefore, we determine that the trial court did not err in denying McClellan's motion to suppress all physical evidence relating to the traffic stop because the deputy had reasonable suspicion to extend the stop and investigate whether McClellan had been driving under the influence of alcohol.

*Was the Search of McClellan's Car Legal?*

McClellan next argues that the sergeant's recovery of physical evidence from McCelllen's car while the deputy was interviewing him constituted an illegal search.

13

McClellan specifically argues that the search was illegal because the passengers did not have authority to consent to the search, the search occurred before his arrest, and the sergeant did not have probable cause to search the car. McClellan also argues that the State did not carry its burden to establish that an exception to the warrant requirement existed because "the State presented no evidence or legal argument to establish the legality" of the search.

The United States Constitution and the Kansas Constitution both protect citizens against unreasonable searches and seizures. *State v. Stevenson*, 299 Kan. 53, 58, 321 P.3d 754 (2014). Unless an exception to the warrant requirement exists, a warrantless search of a citizen is per se unreasonable under the Fourth Amendment to the United States Constitution. *Stevenson*, 299 Kan. at 58. The exceptions to the warrant requirement include the following: (1) consent; (2) search incident to a lawful arrest; (3) stop and frisk; (4) probable cause plus exigent circumstances; (5) the emergency doctrine; (6) inventory searches; (7) plain view or feel; and (8) administrative searches of closely regulated businesses. *State v. Sanchez-Laredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012).

The probable cause plus exigent circumstances exception includes what is commonly referred to as the automobile exception. *Stevenson*, 299 Kan. at 58. If a law enforcement officer has probable cause to believe that a vehicle contains contraband or evidence of a crime, the Fourth Amendment to the United States Constitution does not require a warrant to search the vehicle if it is readily mobile. *Stevenson*, 299 Kan. at 58. Probable cause to search a vehicle is "'"established if the totality of the circumstances indicates there is a "fair probability" that the vehicle contains contraband or evidence [of a crime]."'" [Citations omitted.]" *Stevenson*, 299 Kan. at 64.

Here, the sergeant asked the passengers if there were any open containers of alcohol in McClellan's car. The passengers then produced one bottle of Rich & Rare Whisky and one plastic cup that contained alcohol. Both containers were unsealed when

the sergeant recovered them from McClellan's car. K.S.A. 2015 Supp. 8-1599 makes it illegal to transport open containers of alcohol. The totality of the circumstances indicated that there was a fair probability that the car contained more open containers of alcohol because three occupants were in the car. Therefore, the sergeant had probable cause to search McClellan's car for additional open containers of alcohol.

Moreover, the sergeant's later recovery of the plastic container that contained methamphetamine was likely supported by the plain view exception. The plain view exception to the warrant requirement will apply when (1) an officer was in a lawful position to view the recovered object; (2) the incriminating character of the item recovered was immediately apparent; and (3) the officer had a lawful right to access the recovered item. *Horton v. California*, 496 U.S. 128, 137, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); see *State v. Fisher*, 283 Kan. 272, 292-99, 154 P.3d 455 (2007).

Here, both the deputy and the sergeant saw McClellan empty his pockets and throw a small plastic object into his car before the deputy patted him down. The sergeant looked into McClellan's car and saw the small container on the floor. The sergeant noticed that the container had the number "420" written on it multiple times. The sergeant had learned through his training and experience that "420" was a symbol related to the consumption of marijuana. The sergeant also could see that the plastic container held a white or clear substance that he identified as narcotics.

Thus, based on the fact that the sergeant had probable cause to search the car for open containers of alcohol, he was in a lawful position to view the plastic container on the floorboard of McClellan's car. Also, the sergeant immediately saw the incriminating nature of the contents of the plastic container. Finally, the sergeant had a lawful right to access the plastic container because he had probable cause to search McClellan's car for additional open containers of alcohol.

15

In conclusion, McClellan's assertion that the State did not present any evidence to establish the legality of the search is incorrect. Based on the deputy's testimony at the suppression hearing and the sergeant's report, which was an exhibit at the suppression hearing, it becomes clear that the sergeant had probable cause to search McClellan's car when the passengers produced two open containers of alcohol. When the sergeant had probable cause to search McClellan's car for more open containers of alcohol, he saw the small plastic container that McClellan had thrown into the car. The sergeant identified the contents of the plastic container as narcotics and recovered the container from the driver's side floorboard. The container was in plain view and its recovery was supported by the plain view exception to the warrant requirement and the automobile exception to the warrant requirement.

Alternatively, McClellan asserts that *all* the evidence obtained from the search— the alcohol bottle, methamphetamine container, breath test results, blood test results— should be suppressed as fruit of the poisonous tree. See *State v. Deffenbaugh*, 216 Kan. 593, 598-99, 533 P.2d 1328 (1975) (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 [1963]). As was established earlier, however, the sergeant's search of McClellan's car and later recovery of the plastic container holding methamphetamine was not an illegal search. Thus, McClellan's argument fails.

*Did the Use of the Implied Consent Advisories Render the Results of McClellan's Blood Test Inadmissible?*

Before we address McClellan's argument, it must be noted that the State questions whether McClellan properly preserved this issue for appeal. The State argues that McClellan objected only to the admissibility of the State's exhibits based on the argument that the stop and later search of his car was illegal. The State asserts that McClellan failed to raise any foundation or consent issues relative to the implied consent advisory at the trial court level.

16

Generally, issues not raised before the trial court cannot be raised for the first time on appeal. *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Exceptions to the general rule include the following: (1) The new issue involves a question of law arising out of proved or admitted facts and is finally determinative of the case; (2) the consideration of the issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

McClellan concedes that he did not present an argument to the trial court that his consent was involuntary. McClellan argues, however, that the first two exceptions to the rule are applicable to his appeal. Specifically, McClellan argues that *Nece*, 303 Kan. 888, decision makes it so that his issue involves a question of law arising out of admitted facts that would be finally determinative in this appeal. He also argues that consideration of his argument is necessary to avoid the denial of his fundamental right to not be subjected to unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

McClellan is correct that the issue of whether his consent was coerced is a question of law. This is especially true after our Supreme Court's recent decisions relating to the implied consent advisories addressed later. Also, it is essentially advanced on admitted or proven facts. It is undisputed that McClellan provided the deputy with his consent to submit to a blood test only after the deputy read McClellan the implied consent advisories. Specifically, McClellan provided his consent after the deputy told him that he could be charged with the separate crime of refusal to submit to the blood test. Further, McClellan's conviction for driving under the influence was based on the results of his blood test. So, the issue would likely be finally determinative of his case, at least as it relates to the driving under the influence conviction. Moreover, McClellan is certainly correct that the implied consent advisories implicate his fundamental right to

17

reasonable searches and seizures under the Fourth Amendment to the United States Constitution. See *Nece*, 303 Kan. at 891. For these reasons, and in the interest of justice, we will address this issue.

McClellan argues that his consent to the blood test was coerced, and therefore involuntary, because it was given only after the deputy read the implied consent advisories to him. McClellan asserts that our Supreme Court's decision in *State v. Nece*, 303 Kan. 888, 367 P.3d 1260 (2016), held that the implied consent advisories render consent to a blood test involuntary and therefore invalid. Thus, McClellan argues that the results of his blood test must be suppressed.

In *Nece*, our Supreme Court reconciled the implied consent advisories with *State v. Ryce*, 303 Kan. 899, 368 P.3d 342 (2016), in which it held that K.S.A. 2014 Supp. 8-1025, which provided for the separate crime of refusing to submit to a test to determine the presence of alcohol or drugs, was unconstitutional. The court in *Nece* stated:

> "In *State v. Ryce* . . . we discussed K.S.A. 2014 Supp. 8-1025, which provides for the separate crime of refusal to submit that was referenced by law enforcement's advisory warning, and held that 8-1025 is facially unconstitutional. We must now decide whether our holding in *Ryce* has any effect on the advisory notice law enforcement is required to provide DUI suspects. In light of *Ryce*, we conclude that Nece's consent was unduly coerced because, contrary to the informed consent advisory, the State could not have constitutionally imposed criminal penalties if Nece had refused to submit to breath-alcohol testing. Thus, because Nece's consent was premised on the inaccurate information in the advisory, Nece's consent was involuntary." 303 Kan. at 889.

Thus, the facts of the present appeal lead us to conclude that, like the defendant in *Nece*, McClellan's consent was based on the inaccurate information in the advisory that he could be charged with the separate crime of refusal to submit, which was declared

18

unconstitutional in *Ryce*. Therefore, the State cannot rely on McClellan's consent to the warrantless blood test because his consent was involuntary.

The State argues, however, that the deputy's reliance on the implied consent advisories does not warrant suppression of the results of the blood test. Instead, the State argues that the good-faith exception to the exclusionary rule applies to the deputy's reliance on the implied consent advisories. The State argues that the deputy "had no reason to question the judgment of the legislature in requiring the implied consent advisory. [The deputy's] reliance on the statute was objectively reasonable: the statute was not clearly unconstitutional . . . ." On the other hand, McClellan argues that the good-faith exception should not apply because it "does not apply to unconstitutionally coerced searches, and the statute was clearly unconstitutional so that any officer should have realized that any consent obtained after the advisory was unconstitutional."

As was discussed earlier, warrantless searches are per se unreasonable unless they fall within an exception to the warrant requirement. See *Stevenson*, 299 Kan. at 58. Neither the United States Constitution nor the Kansas Constitution contain an express prohibition of the use of evidence obtained in violation of their protections. *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010). The exclusionary rule is a judicially fashioned remedy which prevents the State from using evidence obtained in violation of the Fourth Amendment to the United States Constitution against the subject of the illegal search in a criminal proceeding. *State v. Pettay*, 299 Kan. 763, 768, 326 P.3d 1039 (2014). The exclusionary rule is not a personal constitutional right. 299 Kan. at 769. Instead, the rule aims to protect Fourth Amendment rights through deterrence. *Daniel*, 291 Kan. at 496. The United States Supreme Court has explained that the exclusionary rule applies only when deterrence will be achieved:

"As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced.

19

Thus, in various circumstances, the Court has examined whether the rule's deterrent effect will be achieved, and has weighed the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process." *Illinois v. Krull*, 480 U.S. 340, 347, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987).

In *Krull*, the Court announced an exception to the exclusionary rule for when a law enforcement officer reasonably and in good faith relies on a statute that is later found to be unconstitutional. The Court noted that the exclusionary rule's goal of deterrence would not be served by excluding such evidence:

"The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." *Krull*, 480 U.S. at 349-50.

In *Daniel*, our own Supreme Court expressly adopted the exception to the exclusionary rule set out in *Krull*. See *Daniel*, 291 Kan. at 500. Our Supreme Court noted that the exception is not unlimited but rather is constrained by the requirement that the officer's reliance on the statute be objectively reasonable. 291 Kan. at 500 (citing *Krull*, 480 U.S. at 355). The court noted that whether an officer's reliance on a statute was objectively reasonable depends on whether the officer should have known that the statute was unconstitutional and whether the legislature "'wholly abandoned its responsibility to enact constitutional laws'" when it passed the statute in question. 291 Kan. at 500 (quoting *Krull*, 480 U.S. at 355).

Thus, we must first assess whether the deputy should have reasonably known that the implied consent advisories were unconstitutional. Then, we must determine whether the legislature wholly abandoned its responsibility to pass constitutional legislation relating to the implied consent advisories. See *State v. Meitler*, 51 Kan. App. 2d 308, 314, 347 P.3d 670, *rev. denied* 302 Kan. 1017 (2015).

McClellan argues that the deputy should have recognized that threatening criminal sanctions to obtain consent was unconstitutional. McClellan cites *Birchfield v. North Dakota*, 579 U.S. __, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016); *Camara v. Municipal Court*, 387 U.S. 523, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967), and as authority for his assertion. But *Birchfield*, the United States Supreme Court case that in large part led to our Supreme Court's findings in *Ryce*, was not decided until 2016, long after the deputy had read the implied consent advisories to McClellan. Moreover, *Camara* dealt with the propriety of warrantless administrative searches, not consensual searches. See 387 U.S. at 540. Finally, McClellan argues that *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), which established that, absent exigent circumstances, warrantless blood draws by law enforcement violate the Fourth Amendment to the United States Constitution. *McNeely* dealt with an individual who refused to provide consent and then was subjected to a warrantless blood draw. 133 S. Ct. at 1557. The United States Supreme Court found that this violated the individual's rights under the Fourth Amendment to the United States Constitution. 133 S. Ct. at 1557-58.

But the fact remains that when McClellan was arrested, the deputy obtained what he thought was valid consent. In *Camara*, the individual did not consent to the search of his home. See 387 U.S. at 540. In *McNeely*, the individual also withheld his consent to the blood draw. See 133 S. Ct. at 1557. McClellan did provide his consent when he was arrested. The fact that the deputy here obtained McClellan's consent, even though we now know that the consent was involuntary, distinguishes this appeal from the authorities

21

cited. Still, we must consider whether the deputy should have known that the implied consent advisories were unconstitutional.

To begin, the State urges us to look to *State v. Kraemer*, 52 Kan. App. 2d 686, 371 P.3d 954 (2016), to determine whether the deputy should have reasonably known that the implied consent advisories were unconstitutional. In *Kraemer*, the court explained:

"[The officer] gave [the defendant] a written copy of the required implied consent advisory in effect at the time, which stated—among other things—that if a person refuses to submit to testing and other prerequisites are met, he or she 'may be charged with a separate crime . . . which carries criminal penalties equal to or greater than those for the crime of driving under the influence.' K.S.A. 2015 Supp. 8-1001(k)(4). After giving him a written copy, [the officer] then read the implied consent advisory to [the defendant] out loud. After reading the advisory, [the officer] then asked [the defendant] to submit to a breath-alcohol test. [The defendant] consented to submit to the test as requested." 52 Kan. App. 2d at 695.

The *Kraemer* court held that the trial court properly applied the good-faith exception to the exclusionary rule:

"The criminal penalty statute was struck down by the Kansas Supreme Court as unconstitutional only after Kraemer's arrest. At the time [the officer] arrested [the defendant], K.S.A. 2015 Supp. 8-1001(k), a facially valid statute, required that the officer advise [the defendant] of the criminal consequences of refusing to submit to the test before asking [the defendant] to do so. At that time, the Kansas Supreme Court had not yet found the statute unconstitutional. Although the Kansas Supreme Court ultimately struck down the criminal penalty statute, similar statutes in other states have been deemed constitutional by those states. [Citations omitted.]" 52 Kan. App. 2d at 698.

Furthermore, in *State v. Rincon*, No. 113,741, 2016 WL 3856670, at *5 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* August 12, 2016, this court held

22

that an officer who gave the implied consent advisory had "'simply fulfill[ed] his responsibility to enforce the statute as written.' [Citation omitted.]" Similar to *Kraemer*, the defendant in *Rincon* provided his consent to a breath test after the officer read him the implied consent advisories. Echoing the sentiment of the United States Supreme Court in *Krull*, the *Rincon* court made clear that penalizing the officer for reading the implied consent advisories would not serve the purpose of the exclusionary rule and deter future violations of the Fourth Amendment to the United States Constitution. 2016 WL 3856670, at *5.

The overarching facts from *Kraemer* and *Rincon* are essentially identical to the facts of our present appeal, except that the defendants in *Kraemer* and *Rincon* were asked to consent to a breath test and McClellan was asked to consent to a blood test. This distinction, however, is of no consequence. K.S.A. 2015 Supp. 8-1567(a)(2) provides that an individual may be charged with driving under the influence if "the alcohol concentration in the person's *blood or breath . . .* is .08 or more." (Emphasis added.) Both McClellan and the defendants in *Kraemer* and *Rincon* were charged with driving under the influence under K.S.A. 2015 Supp. 8-1567(a)(2). See *Kramer*, 52 Kan. App. 2d at 690; *Rincon*, 2016 WL 3856670, at *1.

Here, McClellan was pulled over in September 2014. The implied consent advisories were not struck down until February 2016. Moreover, when McClellan was arrested, our courts had consistently upheld the validity of consent obtained after giving the implied consent advisories. See, *e.g.*, *Nece*, 303 Kan. at 892-93; *State v. Johnson*, 297 Kan. 210, 223, 301 P.3d 287 (2013). The State urges us to find that the deputy was "simply fulfill[ing] his responsibility to enforce the statute as written." See *Krull*, 480 U.S. at 350. After examination, the facts of this appeal tend to point us in such a direction. For these reasons, there is no indication that the deputy, relying on the implied consent law in September 2014, should have reasonably known that the law was unconstitutional.

23

Next, we must consider whether the legislature wholly abandoned its responsibility to pass constitutional legislation relating to the implied consent advisories. But first, it must be understood that McClellan advances no argument relating to whether the Kansas Legislature abandoned its responsibility in passing the implied consent law. An issue that is not briefed by an appellant will be deemed waived or abandoned. *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016).

A brief discussion will show that even if McClellan had presented an argument that the Kansas Legislature wholly abandoned its responsibility to pass constitutional legislation, his argument would have failed. This court will generally presume that the legislature acts with adequate knowledge of its statutory subject matter, including prior and existing law, and judicial decisions interpreting the same. *State v. Kershaw*, 302 Kan. 772, 782, 359 P.3d 52 (2015). This court will further presume that statutes passed are constitutional. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127 (2016).

In *Meitler*, this court noted that "the Kansas implied consent law was originally passed by the legislature in 1955[,] . . . [and] [s]ince that time, although it has undergone numerous amendments, officers have become accustomed to the statutory scheme which has essentially remained the same over the years." 51 Kan. App. 2d at 316. The *Meitler* court further acknowledged that "in the 28 years since *Krull* was issued, there does not appear to be any reported cases wherein a federal or state appellate court declined to apply the good-faith exception because a legislative body wholly abandoned its responsibility to enact constitutional laws. [Citations omitted.]" 51 Kan. App. 2d at 317. Indeed, as the United States Supreme Court stated in *Krull*, "the exclusionary rule [is] aimed at deterring police misconduct[; citation omitted,] . . . legislators, like judicial officers, are not the focus of the rule." 480 U.S. at 350.

Again, Kansas courts presume that the legislature passes constitutional legislation. Thus, where the implied consent law had existed in one form or another for about 60

24

years before it was invalidated, and where a finding that a legislature has wholly abandoned its responsibility to pass constitutional legislation is exceptionally rare, it cannot be said that the Kansas Legislature wholly abandoned its responsibility to do the same here.

It is undisputed that McClellan's consent to the blood test was coerced in light of the holdings from *Ryce* and *Nece*. Instead, the question before us was whether the deputy's actions could be vindicated by the good-faith exception to the exclusionary rule. There is no indication that the deputy, as a well-trained officer, should have known that the implied consent law was unconstitutional. Nor is there any indication that the Kansas Legislature wholly abandoned its responsibility to pass constitutional legislation. Moreover, penalizing the deputy here would not serve the purpose of the exclusionary rule—to deter future violations of the Fourth Amendment to the United States Constitution.

McClellan argues, however, that we should render an officer's good-faith reliance on a statute irrelevant, because allowing the good-faith exception to apply to situations involving consent would fly in the face of established consent jurisprudence. McClellan points out that for consent to be valid in Kansas, "(1)[t]here must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the consent must have been given without duress or coercion, express or implied." *State v. Thompson*, 284 Kan. 763, 776, 166 P.3d 1015 (2007). McClellan is correct. Nevertheless, the good-faith exception is narrowly tailored and only used when the purpose of the exclusionary rule, deterrence of future Fourth Amendment violations, would not be served. Thus, applying the good-faith exception to the deputy's reliance on the implied consent law is not an affront on consent—it is simply a way of saying that excluding evidence obtained as a result of the implied consent advisories would not deter future violations of the Fourth Amendment to the United States Constitution. As a result, we determine that the

good faith exception to the exclusionary rule is applicable to this case. See *State v. Schmidt*, 53 Kan. App. 2d 225, Syl. ¶ 2, 385 P.3d 936 (2016).

*Did Sufficient Evidence Exist to Support McClellan's Conviction For Driving Under the Influence?*

When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, an appellate court will review all evidence in the light most favorable to the State. An appellate court will uphold the conviction if it is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on the evidence presented at trial. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). It is generally not within the authority of an appellate court to reweigh the evidence or assess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). An appellate court will only reverse a guilty verdict in the exceptional case where testimony is so incredible that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

K.S.A. 2015 Supp. 8-1567(a)(2), the statute under which McClellan was charged, states that "[d]riving under the influence is operating or attempting to operate any vehicle within this state while: . . . the alcohol concentration in the person's blood or breath, as measured within three hours of the time of operating or attempting to operate a vehicle, is .08 or more." To establish a violation of K.S.A. 2015 Supp. 8-1567(a)(2), the State must prove: (1) the individual charged operated or drove or attempted to operate or drive the vehicle; (2) while driving or attempting to drive, the individual's BAC was .08 or more, as measured within 3 hours of operating or driving or attempting to do so; and (3) the driving occurred on the date alleged and in the county alleged. See *State v. Finch*, 291 Kan. 665, Syl. ¶ 4, 244 P.3d 673 (2011).

McClellan bases his sufficiency argument on the KBI's blood test results. McClellan specifically argues that "the sole evidence establishing the blood alcohol concentration was a KBI report showing 'Uncertainty of Measurement is .084 ± 0.006' resulting in a range of measurement from .078 to .090." The test listed 0.08 BAC as the final result. The KBI's test results also listed that the test had a confidence level of 99.7%. Thus, McClellan argues that the evidence is insufficient to support his conviction because his test results may have been as low as .078 BAC, which would not support a conviction under K.S.A. 2015 Supp. 8-1567(a)(2) which requires a BAC of .08.

McClellan begins his analysis with a useful bit of information about uncertainty of measurement from a Washington state court of appeals decision:

"Every measurement is 'uncertain,' in that no instrument is infinitely precise or accurate. The concept of measurement uncertainty is similar to the concept of margin of error and expresses the idea that a true value of a measurement can never be known. Even the best instruments yield only an estimate of the true value. Uncertainty indicates a range in which the true value of a measurement is likely to occur." *State v. King County Dist. Court West Div.*, 175 Wash. App. 630, 638, 307 P.3d 765 (2013).

In *Finch*, our own Supreme Court acknowledged that a margin of error or uncertainty measurement could give rise to issues in cases involving driving under the influence:

"A defendant in a prosecution under K.S.A. 8-1567(a)(2) may raise and argue margin of error or other questions about the reliability or accuracy of his or her blood- or breath-alcohol concentration 'as measured,' in the same way he or she can challenge whether the test was conducted within 2 hours of operating or attempting to operate a vehicle. [Citation omitted.]" 291 Kan. at 673.

27

Of course, the time limitation in K.S.A. 2015 Supp. 8-1567(a)(2) is now 3 hours, and not 2 hours, but the principle remains the same.

In *Ruble v. Kansas Dept. of Revenue*, 26 Kan. App. 2d 1, 6, 973 P.2d 213 (1999), this court held that "[t]he statutes [relating to revocation of a driver's license after a DUI conviction] do not require the test result to pass the threshold alcohol limit of .08 within a margin of error. If the legislature had intended for the margin of error to be a factor, it could have easily included such a requirement in the statutes." In *City of Hutchinson v. Minor*, No. 90,088, 2003 WL 22831740, at *2 (Kan. App. 2003) (unpublished opinion), this court extended the same analysis to K.S.A. 8-1567(a)(2), holding that

> "[s]imilar to the statute analyzed in *Ruble*, K.S.A. 8-1567(a)(2) does not require the breath test result to be above the margin of error. K.S.A. 8-1567(a)(2) simply requires that 'the alcohol concentration in the person's blood or breath, as measured within two hours of the time of operating or attempting to operate a vehicle, is .08 or more.'"

Instead, margin of error, or in our case "Uncertainty of Measurement," is only one factor to be considered by the factfinder and is not dispositive for the State or the defendant. See *Finch*, 291 Kan. at 673 (citing *State v. Miller*, No. 99,460, 2009 WL 1766150, at *1 [Kan. App. 2009] [unpublished opinion]; *Minor*, 2003 WL 22831740, at *2-4).

McClellan argues, though, that his case is unique in that "Kansas [c]ases have not addressed an undisputed margin of error." He extends his argument, positing that "this is the rare case where the uncontroverted evidence in the KBI's report establishes that the margin of error places the test results below the legal limit and finding insufficient evidence is appropriate." McClellan argues that *State v. Pendleton*, 18 Kan. App. 2d 179, 849 P.2d 143 (1993), should be our guide in making the determination that the evidence was insufficient.

28

In *Pendleton*, the defendant was charged with driving under the influence under K.S.A.. 8-1567(a)(2) (Furse 1991)after being involved in an accident. The defendant later consented to a blood test, which showed his BAC was .19. The court found that to obtain a conviction under 8-1567(a)(2), the State must prove that the defendant's blood had been tested *within* 2 hours of the last time the defendant operated or attempted to operate his vehicle. 18 Kan. App. 2d 179, Syl. ¶ 2. The court held that "whether the State complied with the two-hour time limitation is a foundational question to be determined by the trial court." 18 Kan. App. 2d 179, Syl. ¶ 3. The trial court in *Pendleton* had found "that the blood test was administered 'approximately' 2 hours from the time of the accident." 18 Kan. App. 2d at 181. On appeal, the defendant argued that the State could not prove that the blood test was administered within 2 hours of the accident. The State even admitted that the accident may have occurred more than 2 hours before the blood test was conducted. On appeal, the court reversed the defendant's conviction and vacated his sentence, finding that the critical point was "the trial court's factual finding that the test was administered approximately two hours after the accident." 18 Kan. App. 2d at 187.

Here, the trial court very clearly found that McClellan's BAC, based on the KBI's test result, was 0.08, in violation of K.S.A. 2015 Supp. 8-1567(a)(2). Thus, unlike the trial court in *Pendleton*, the trial court here did not make an approximate finding. Despite the existence of an "uncertainty of measurement," the trial court made a clear finding that McClellan's BAC was above the legal limit. This point distinguishes our appeal from *Pendleton*. In *Pendleton*, the sticking point was the trial court's finding that the blood draw had occurred "approximately" 2 hours after the defendant's accident. The *Pendleton* court may very well have reached a different result had the trial court there made a positive finding that the blood draw had occurred *within* 2 hours of the defendant's accident. Furthermore, a common-sense examination of time and scientific measurements shows us that the two are not easily compared. Time contains no uncertainty of measurement—it is completely objective—a second is a second as a minute is a minute. But the presence of uncertainty in scientific measurement is simply a scientific reality.

This uncertainty has been acknowledged and addressed by Kansas courts in similar situations. Neither McClellan nor the State addresses *Minor*, a case which offers us relevant guidance in light of the facts of McClellan's appeal. In *Minor*, the court dealt with a similar argument relating to the margin of error present in the defendant's breath test results. There, the defendant's breath test produced a result of 0.084 blood alcohol concentration (BAC). The breathalyzer machine in *Minor* had an alleged margin of error of plus or minus 0.010. The defendant argued that the result of the breath test, in light of the margin of error, was insufficient to convict him of DUI. The defendant claimed "that it was impossible for a rational jury to find him guilty beyond a reasonable doubt because his actual breath test result could have been as low as 0.074." 2003 WL 22831740, at *2. The court found that the alleged margin of error was a fact proper for the factfinder, in that case a jury, to consider. 2003 WL 22831740, at *3. The *Minor* court held that "[o]nce the City established the foundation for admissibility of the breath test result, it was up to [the defendant] to attack the accuracy of the test result by cross-examining the evidence and by presenting expert testimony." 2003 WL 22831740, at *3. Moreover, when the defendant failed to attack the result, the court refused to adjust the result downward by the margin of error. 2003 WL 22831740, at *3-4.

Here, McClellan clearly had the opportunity to attack the result of the blood test at trial, but he failed to do so. In fact, McClellan failed to object to the admissibility or foundation of the test results at trial. Instead, McClellan relied on his argument raised in his motion to suppress the evidence.

McClellan argues, that "[l]ike *Pendleton*, this is a case where something that is often a jury question, usually a battle of experts over the existence of a margin of error, is purely an issue of legal sufficiency because the evidence is uncontroverted." He asserts that "[e]vidence of a range both above and below .08 does not by definition present sufficient evidence to allow a reasonable factfinder to conclude beyond a reasonable doubt that [his] [BAC] was .08 or more." McClellan argues that his case is different

30

because the KBI report contains the Uncertainty of Measurement, which means its existence is not in dispute. Thus, McClellan argues that this court should make a distinction between disputed and undisputed margins of error.

McClellan asks us to consider *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000), an opinion from the Supreme Court of Nebraska, in making a distinction between disputed and undisputed margins of error. The Nebraska court held

> "that where the State is able to prove alcohol content only within a specified range, the lower point of which falls below the statutory value which affords a basis for a DUI conviction, it has failed to meet its burden of proof of guilt beyond a reasonable doubt. The same rationale would not apply where the State makes a prima facie showing with chemical test results of blood or breath alcohol levels which meet or exceed the statutory threshold for a DUI conviction and the defendant counters with evidence that the tests utilized carry a margin of error which, when applied to the test result, could produce a value which is less than the statutory limit." 258 Neb. at 978.

The fact remains, though, that Kansas law does not require consideration of a chemical test's margin of error or uncertainty measurement in determining whether an individual's BAC is equal to or greater than .08. See *Minor*, 2003 WL 22831740, at *3 (citing *Ruble*, 26 Kan. App. 2d at 6). Moreover, Kansas appellate courts will not read something into a statute that is not readily found in its plain language. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). Regardless of what Nebraska courts have to say on the issue, this is a hurdle that McClellan's argument cannot clear. As a result, we will not adjust the result of the KBI's blood test downward by the uncertainty of measurement. Instead, we determine that the uncertainty of measurement in McClellan's blood test was a fact to be considered by the trial judge in making his finding that McClellan violated K.S.A. 2015 Supp. 8-1567(a)(2). Thus, we determine that sufficient evidence existed to support McClellan's conviction for driving under the influence under K.S.A. 2015 Supp. 8-1567(a)(2).

31

*Did the Trial Court Err in Considering McClellan's Prior Nebraska Conviction For Driving Under the Influence?*

McClellan argues that the trial court erred in using his prior Nebraska conviction for DUI to enhance his sentence because the Nebraska DUI statute criminalizes a broader range of actions than the Kansas DUI law. Thus, McClellan asserts that his sentence was illegal.

Whether a sentence is illegal under K.S.A. 22-3504 is a question of law over which this court has unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016). This means that an illegal sentence issue may be raised for the first time on appeal. *State v. Dickey*, 301 Kan. 1018, 1027, 350 P.3d 1054 (2015).

In determining whether a prior conviction may be used to enhance a defendant's sentence, the trial court is constitutionally prohibited under *Descamps v. United States*, 570 U.S. ___, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2005), from making additional findings of fact beyond identifying statutory elements of the prior adjudication. *Dickey*, 301 Kan. at 1039.

Here, the trial court did not make any additional factual findings. Instead, the trial court relied on McClellan's driving record from the Nebraska Department of Motor Vehicles that was part of the State's evidence. Thus, the trial court did not run afoul of *Apprendi* or *Descamps*.

McClellan's driving record indicated that in 2009 he was convicted of driving under the influence under Neb. Rev. Stat. § 60-6,196 (2004). K.S.A. 2015 Supp. 8-1567(i)(3)(B) states that

"[f]or the purpose of determining whether a convictions is a first, second, third, fourth or subsequent conviction in sentencing under this section . . . (3) 'conviction' includes: . . . (B) conviction of a violation of . . . any law of another state which would constitute a crime described in subsection (i)(1) . . . ."

Subsection (i)(1) includes "[c]onvictions for a violation of this section . . . ."

Thus, we must compare the Kansas and Nebraska DUI statutes to determine whether McClellan's prior conviction for DUI in Nebraska was properly considered under K.S.A. 2015 Supp. 8-1567(i). Specifically, we must determine whether the Nebraska DUI statute is broader than the Kansas DUI statute. If the answer to that question is yes, then McClellan's prior conviction cannot be used for sentencing purposes. See *State v. Stanley*, No. 112,828, 2016 WL 1274465, at *2 (Kan. App. 2016) (unpublished opinion), *rev. denied* 304 Kan. 1022 (2016); *State v. Butler*, No. 107,767, 2013 WL 1457958, at *1 (Kan. App. 2013) (unpublished opinion).

Our question, then, is one of statutory interpretation. Statutory interpretation involves questions of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The most fundamental rule of statutory interpretation is that the intent of the legislature governs if that intent can be ascertained. *State v. Jordan*, 303 Kan. 1017, 1019, 370 P.3d 417 (2016).

McClellan was arrested and charged with DUI under K.S.A. 2015 Supp. 8-1567(a)(2) or, in the alternative, K.S.A. 2015 Supp. 8-1567(a)(3). But our inquiry is not confined to the exact provision under which he was charged. Instead, we must consider, as a whole, whether the same acts that are prohibited by the Nebraska DUI law are prohibited by the Kansas DUI law.

McClellan's driving record indicates that he was convicted of DUI in Nebraska in 2009 under Neb. Rev. Stat. § 60-6,196 (2004). The Nebraska statute provided:

"(1) It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle:

(a) While under the influence of alcoholic liquor or of any drug;

(b) When such person has a concentration of eight-hundredths of one gram or more by weight of alcohol per one hundred milliliters of his or her blood; or

(c) When such person has a concentration of eight-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his or her breath." Neb. Rev. Stat. § 60-6,196 (2009).

The Kansas statute provides:

"(a) Driving under the influence is operating or attempting to operate any vehicle within this state while:

(1) The alcohol concentration in the person's blood or breath as shown by any competent evidence, including other competent evidence, as defined in paragraph (1) of subsection (f) of K.S.A. 8-1013, and amendments thereto, is .08 or more;

(2) the alcohol concentration in the person's blood or breath, as measured within three hours of the time of operating or attempting to operate a vehicle, is .08 or more;

(3) under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle;

(4) under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle; or

(5) under the influence of a combination of alcohol and any drug or drugs to a degree that renders the person incapable of safely driving a vehicle." K.S.A. 2015 Supp. 8-1567(a).

First, McClellan argues "that the Nebraska law criminalizes driving while 'under the influence of alcoholic liquor' whereas the Kansas law prohibits driving while 'under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle.' [Citations omitted.]" McClellan urges this court to look to our recent decision in *Stanley* to find that the Nebraska statute criminalizes broader conduct than the Kansas statute.

34

In *Stanley*, the court held that Kansas DUI law prohibits two acts: "(1) operating or attempting to operate a vehicle with a blood- or breath-alcohol concentration in excess of .08; and (2) operating or attempting to operate a vehicle while under the influence of alcohol and/or drugs to a degree that renders the person incapable of safely driving the vehicle." 2016 WL 1274465, at *2. The court then considered the Missouri statute that provided: "'A person commits the crime of 'driving while intoxicated' if he operates a motor vehicle while in an intoxicated or drugged condition.' [Citation omitted.] [A] person is in an "intoxicated condition" when he is *under the influence of alcohol*, a controlled substance, or drug, or any combination thereof.' [Citation omitted.]" 2016 WL 1274465, at *2. The *Stanley* court found that

> "[t]he Missouri statute on its face is too broad to count as a prior conviction under K.S.A. 2012 Supp. 8-1567(i). Clearly, driving 'under the influence' of alcohol covers a wider range of activity than driving under the influence of alcohol 'to a degree that renders the person incapable of safely driving a vehicle' or 'driving with an alcohol concentration of .08 or more.'" 2016 WL 1274465, at *2.

The court further found that "[a] driving impairment may not necessarily render a person incapable of safely driving a vehicle." 2016 WL 1274465, at *3. Thus, the court held that

> "[w]hile the State is correct that the Missouri statute criminalizes some of the same conduct that the Kansas statute criminalizes, it is clearly conceivable that an act that would be considered DWI in Missouri would not be DUI in Kansas. Therefore, [the defendant's] Missouri DWI conviction should not have been considered as part of his criminal history under K.S.A. 2012 Supp. 8-1567(i)." 2016 WL 1274465, at *4.

McClellan argues that the Nebraska DUI statute is broader because it does not contain "a limited window for testing . . . ." McClellan is of course referring to the fact that the Kansas DUI statute requires that "the alcohol concentration in the person's blood

35

or breath . . . [be] measured within three hours of the time of operating or attempting to operate a vehicle." K.S.A. 2015 Supp. 8-1567(a)(2). Nebraska's DUI statute does not contain any temporal element or restriction.

During oral argument, the State conceded that the Nebraska DUI statute criminalized a broader range of action than the Kansas DUI statute. To illustrate, the Neb. Rev. Stat. § 60-6,196(b) and (c) (2004), like Kansas prohibits the driving with an alcohol concentration of .08. Unlike the Kansas DUI statute, K.S.A. 2015 Supp. 8-1567(a)(2), the Nebraska statute has been interpreted to provide a reasonable time for conducting the testing. Nevertheless, in Kansas, the DUI testing must be conducted within 3 hours of operating the vehicle. Without a similar time period, the Nebraska statute criminalizes a broader range of action than the Kansas DUI statute. As a result, the prior Nebraska conviction cannot be used for sentencing purposes in McClellan's case.

Affirmed in part, vacated in part, and remanded for resentencing consistent with this opinion.